JAROSLAV BRTEK, ALSO KNOWN AS JERRY BRTEK, AND LILLIAN L. BRTEK, APPELLANTS, V. LAD L. CIHAL AND MARTHA B. CIHAL, APPELLEES.

515 N.W.2d 628

Filed April 28, 1994.   No. S-92-164.

George H. Moyer, Jr., of Moyer, Moyer, Egley, Fullner & Warnemunde, for appellants.

Charles H. Wagner, of Edstrom, Bromm, Lindahl, Wagner & Miller, and George E. Svoboda, of Sidner, Svoboda, Schilke, Thomsen, Holtorf & Boggy, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

HASTINGS, C.J.

This is an action by Jaroslav Brtek, also known as Jerry Brtek, and Lillian L. Brtek against Jerry's sister and her husband, Martha and Lad Cihal. By their fourth amended petition, the Brteks sought to impose a constructive or a resulting trust upon two farms, the Urbanek place and the Pedersen place, to which the Cihals held the record title. Additionally, they asked that a certain deed, which was dated April 30, 1960, conveying the Urbanek place from Joe Brtek, a deceased brother, to Joe himself and Martha Cihal, be canceled. The Cihals, in their answer, denied the Brteks' claims and counterclaimed, asking that a deed conveying certain other property not involved in this appeal from Agnes Brtek, the mother of Jerry and Martha, to Jerry be set aside because of an alleged failure of Jerry to comply with certain conditions therein.

Following a bench trial, the court entered judgment, finding that the Brteks had failed to establish a resulting or constructive trust by clear and convincing evidence and had failed to prove their allegations as to the requested deed cancellation, and that

the Cihals had failed to prove the allegations of their counterclaim. Although it is difficult to trace the titles from the language of the decree because it refers to descriptions in the pleadings which do not match, it appears that titles to the Urbanek and Pedersen places were confirmed in the Cihals, and title to the home place in the Brteks. The Brteks have appealed, but the Cihals have not appealed the dismissal of their counterclaim. The Brteks assign eight errors, which may be summarized to allege that the decree of the trial court was contrary to law and was not sustained by the evidence, and that their case was wrongfully dismissed.

Although throughout this opinion we will refer to the various properties by name, we set forth the legal description of each:

*Home place*—The South Half of the Southeast Quarter ($S^1/_2$ $SE^1/_4$) of Section Eight (8) and the Northeast Quarter of the Northeast Quarter ($NE^1/_4$ $NE^1/_4$) of Section Seventeen (17), Township Sixteen (16) North, Range Five (5) East of the 6th P.M., Saunders County, Nebraska.

*Urbanek place*—The South Half of the Northwest Quarter ($S^1/_2$ $NW^1/_4$) and the South Half of the Northeast Quarter ($S^1/_2$ $NE^1/_4$) of Section Seven (7), Township Sixteen (16) North, Range Five (5) East of the 6th P.M., Saunders County, Nebraska.

*Pedersen place*—The South Half of the Northeast Quarter ($S^1/_2$ $NE^1/_4$) and the North Half of the Southeast Quarter ($N^1/_2$ $SE^1/_4$) of Section Eight (8), Township Sixteen (16) North, Range Five (5) East of the 6th P.M., Saunders County, Nebraska.

*Texel place*—The East Half of the Northeast Quarter ($E^1/_2$ $NE^1/_4$) and the East Half of the Southeast Quarter ($E^1/_2$ $SE^1/_4$) of Section Three (3), Township Fifteen (15) North, Range Six (6) East of the 6th P.M., Saunders County, Nebraska.

Actions to declare a resulting or constructive trust are in equity. *Kuhlman v. Cargile*, 200 Neb. 150, 262 N.W.2d 454 (1978).

In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material

issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Richdale Dev. Co. v. McNeil Co.*, 244 Neb. 694, 508 N.W.2d 853 (1993); *K N Energy, Inc. v. Cities of Broken Bow et al.*, 244 Neb. 113, 505 N.W.2d 102 (1993).

This is an unfortunate situation in which the domineering matriarch of this family, Agnes, who was born in Czechoslovakia and barely spoke, wrote, or read the English language, attempted to control the affairs of her three adult children by requiring them to convey, cross-convey, and reconvey certain real estate which was a part of a family operation. As a result, she turned sister against brother and successfully upset the titles to two parcels of real estate in Saunders County.

It must be understood at the outset that all of the business of this family unit was carried on in the Czech or Bohemian language, and much was lost or distorted in the parties' translation of those activities into English.

Upon the death of Vaclav Brtek in 1949, sons Jerry and Joe, daughter Martha, and wife Agnes inherited from Vaclav a farm known as the home place. On May 18, 1950, the children conveyed their interests in the farm to their mother, Agnes. On June 8, 1950, Agnes conveyed the home place to Jerry. Jerry and Joe continued to farm the land. Some of their earnings went into the family "pool," although Jerry and Joe put money earned from custom farming into separate bank accounts. Martha testified that she did not share in the income from the farming operation, but got "what was from the ducks and geese and chickens." From 1949 until 1961, Agnes filed one income tax return for the whole family, claiming Jerry, Joe, and Martha, her adult children, as dependents. From then on, because of the intervention of the Internal Revenue Service, the mother and the two boys, at least, started filing separate returns. On January 10, 1961, Martha married Lad Cihal and left the family home.

However, before that marriage occurred, the Urbanek place was purchased in 1952, with the various family members contributing to the purchase price of $13,200. The ledger kept

by Martha at Agnes' direction revealed the source of those funds. Joe paid $3,955.92, Agnes $2,400, Jerry $4,450, and Martha $708. A note for $1,200 was also given, and that note and interest were paid from the sale of some steers and corn. The balance of approximately $486 was paid from the assets of the estate of Vaclav Brtek. Record title was taken in the name of Joe Brtek at the direction of Agnes.

Later on, at the direction of Agnes, Joe deeded the Urbanek place to himself and Martha as joint tenants. However, the deed was not given to Martha, but instead was placed by Agnes in her dresser drawer in which the family's papers were kept. Access to this dresser was available to Agnes, Joe, and Jerry, but the record does not reveal whether Martha enjoyed that privilege. Physical possession of that deed was not given to Martha before Joe's death on June 8, 1974.

Shortly after Joe's death, either Agnes brought the deed conveying the Urbanek place to Martha at the latter's home and declared that "the farm is yours" or Martha came to the home place, where Agnes gave her the deed. That deed was filed for record on July 1, 1974.

The petition for the determination of inheritance tax due and owing by reason of Joe's death was executed by both Jerry and Martha. The petition recited that the deed to the Urbanek place was executed by Joe "with instruction that said deed would be filed . . . on the death of the said Joseph Brtek." On August 23, 1974, Martha paid the inheritance tax of $370 on the property. Jerry stated that after the inheritance tax was paid, he and Martha had a conversation at attorney Clyde Worrall's office in which they discussed putting his name on the title to the Urbanek place. However, instead of doing that, Martha executed a deed on April 11, 1975, conveying the Urbanek place to herself and her husband, Lad, as joint tenants, which deed was filed for record on April 14, 1975.

Before Joe's death, he and Jerry farmed the Urbanek place and divided the income, giving one-third each to themselves and one-third to Agnes. After Joe died, Jerry continued to farm the Urbanek place, and Agnes received one-third of the income from this farm and Jerry received two-thirds. During the time that the farm was in the Agricultural Stabilization and

Conservation Service program, Jerry received 60 percent of the payments and Martha received 40 percent.

Jerry stated that he did not pay any rent on the Urbanek place, but paid property taxes. Martha stated that her mother told her not to charge Jerry rent, but a few years before her mother passed away in 1982, Martha started charging rent because she needed the money and could not pay the taxes without getting any crops off the land. Martha charged Jerry $1,600 a year and stated that she did not know how she arrived at that figure but that "he paid me for the taxes and I paid it at the treasurer's." In 1985, Martha demanded that Jerry vacate the premises.

The Pedersen place was purchased by Martha and Lad from a third party by means of a contract dated July 12, 1963. The purchase price was $32,000, with a $1,000 downpayment and a mortgage of $8,000 carried back by the seller. Of the principal balance of $23,000, plus some interest on the mortgage, $3,400 was paid by Joe, $1,800 by Jerry, and $6,481.60 by Agnes with checks dated December 18, 1963, all made payable to the Cihals. According to Jerry, at the time these first payments were made, they were considered a loan to Martha and Lad. Martha insisted that because no notes were signed by her, the payments were gifts. The canceled checks in the record show that the Cihals paid a total of $33,455.50 to the Pedersens, with the last payment having been made on December 31, 1968.

In 1968, Martha told her family she was short of money because they were also buying the Texel place and wanted to sell the Pedersen place. Jerry testified that he, Joe, and Agnes agreed to buy the 160-acre Pedersen place for $200 an acre. Jerry said that they were to pay in installments, with no set time for making payments, and that Martha was to turn the farm over to them when all the installments were paid. Jerry also stated that Martha said that the money loaned to her in 1963 would be accepted as a downpayment for the Pedersen place.

The first payment on the balance of the purchase price, according to Jerry, consisted of a check dated February 26, 1968, in the amount of $5,000 from Agnes to Martha, the proceeds to cover the check having come from the cashing of E bonds which were payable to Agnes, Joe, and himself. Martha

also received checks from Agnes or Joe on February 21, 1970 ($7,000), February 23, 1971 ($4,000), February 21, 1973 ($2,000), and February 26, 1974 ($2,000), as well as other amounts previously set forth. Although acknowledging agreement as to the amounts which the Brteks paid her, Martha testified that she could not recall ever agreeing to sell the Pedersen place to her family; she characterized the amounts listed above as "money Joe and Jerry gifted me."

Jerry stated that he had several conversations with Martha about getting a deed to the Pedersen place and that she hesitated to give it to him because she always needed money, but she never said that she would not give him the deed.

In August 1985, Martha and Jerry had an argument because Martha told Jerry that she intended to sell the Urbanek place so she could buy another farm, and Jerry said that she should not sell it. After this conversation took place, Jerry received a letter from the Cihals' attorney, informing him that his tenancy of the Urbanek farm was to be terminated. Jerry then contacted attorney James Egr. Egr, who did not represent the Brteks at the trial, testified about a meeting which took place between the Cihals and the Brteks and their attorneys on September 19, 1985. At that meeting, Egr questioned Martha about an agreement which Jerry told him that attorney Worrall had prepared stating that the Urbanek place was supposed to be split between Jerry and Martha. Egr stated to Martha that he had contacted Worrall and that Worrall could not find the agreement. When he asked Martha if there was such an agreement and if she remembered signing it, she replied, "Well, yes," and stated that she thought she had it; it was no longer in Worrall's files. The agreement never appeared.

As previously stated, Jerry and Lillian Brtek filed this action on September 9, 1986, seeking to have trusts impressed on the two farms for the benefit of Martha and Jerry, to cancel the deed from Joe to Joe and Martha, to quiet title to the two farms in Jerry and Martha, and for an accounting and general equitable relief. Defendants Lad and Martha Cihal answered and counterclaimed, requesting that a deed to Jerry from Agnes covering other land be set aside because Jerry had failed to comply with a condition therein that he pay Martha $2,000.

The latter issue is not involved in this appeal. On September 30, 1991, the court entered a judgment finding that the plaintiffs had failed to establish a resulting or constructive trust by clear and convincing evidence, that they had also failed to prove the allegations of the second cause of action relating to the deed from Joe to himself and Martha, and that the defendants had failed to prove the allegations of their cross-petition. The plaintiffs' amended petition and the defendants' cross-petition were dismissed. The Brteks filed this appeal.

## THE URBANEK PLACE

In regard to the Urbanek place, the plaintiffs argue that the deed was clearly never delivered by Joe to Martha and, further, that there is clear and convincing evidence that Martha holds the Urbanek place as trustee of a resulting trust.

### DELIVERY OF DEED

It seems apparent from the record that the deed from Joe to Joe and Martha was never delivered during Joe's lifetime.

It is essential to the validity of a deed that there be a delivery, and the burden of proof rests upon the party asserting delivery to establish it by a preponderance of the evidence. To constitute a valid delivery of a deed, there must be an intent on the part of the grantor that the deed shall operate as a muniment of title to take effect presently. *Moseley v. Zieg*, 180 Neb. 810, 146 N.W.2d 72 (1966); *Lewis v. Marker*, 145 Neb. 763, 18 N.W.2d 210 (1945). One of the problems in this litigation is that the only intent supported by evidence in the record is that of Agnes, not of the grantor.

However, the essential fact to render delivery effective always is that the deed itself has left the control of the grantor, who has reserved no right to recall it, and it has passed to the grantee. *Robinson v. Thompson*, 192 Neb. 428, 222 N.W.2d 123 (1974); *Kellner v. Whaley*, 148 Neb. 259, 27 N.W.2d 183 (1947).

No particular acts or words are necessary to constitute delivery of a deed; anything done by the grantor from which it is apparent that a delivery was intended, either by words or acts, or both combined, is sufficient. *In re Estate of Saathoff. Saathoff v. Saathoff*, 206 Neb. 793, 295 N.W.2d 290 (1980);

*Milligan v. Milligan*, 161 Neb. 499, 74 N.W.2d 74 (1955).

Whether a deed or other instrument conveying an interest in property has been delivered is largely a question of intent to be determined by facts and circumstances of the particular case. *In re Estate of Saathoff. Saathoff v. Saathoff, supra*; *Milligan v. Milligan, supra*.

In *Perry v. Markle*, 127 Neb. 29, 254 N.W. 692 (1934), in an action for foreclosure of a mortgage, the plaintiff claimed that there was not sufficient evidence of delivery of the deed by Samuel Perry to his children in 1915. This court found that the deed had been executed and acknowledged and that "some one" of the grantees had possession of the deed ever since that time. The *deed had been recorded a few months after its execution*. Later, the grantor inherited an undivided one-fifth interest in the property, and a mortgage was executed upon the land, in which he and his four surviving children had joined. We concluded that "[t]here can be little question that Samuel H. Perry recognized that the deed had been delivered and that his children had title to the land." *Id*. at 32, 254 N.W. at 694. Although the syllabus of the court in *Perry* states that "[d]elivery of a deed by the grantor to one of several named grantees is sufficient delivery as to all," it is clear from a reading of the opinion that this was only one of several factors which were considered in reaching the conclusion that a valid delivery had been made. Perhaps of great importance were the facts relating to adverse possession and statute of limitations and the fact that the deed was recorded prior to the death of the one grantee. Recordation of a deed generally presumes delivery. *Kresser v. Peterson*, 675 P.2d 1193 (Utah 1984).

In *Kresser*, the testatrix's two stepsons asserted a one-half interest in a home under the terms of a will. The testatrix, Della, had executed a will which devised the home to her two sons and two stepsons. Seven years later, she executed a warranty deed in which she named herself and her two sons as grantees, with right of survivorship. The deed was recorded and placed in a bank safe deposit box under a lease agreement which provided "exclusive access" to the box to the joint tenants. Although the agreement permitted the sons access to the box, they did not know the deed was in the box and did not have a key to the box.

The Utah court stated the general rules: "An effective deed requires delivery, actual or constructive, without exclusive control or recall. Recording generally presumes delivery. Delivery to one cotenant or reservation of an estate connotes delivery to all cotenants, where the grantor is also the grantee." *Id*. at 1194. The court did not rely upon this last rule, however, noting instead that

> [w]ithal the recognized indicia of an effective delivery in this case, perhaps the most significant is the statement of Della at the time she signed the deed. Before a notary public, Della's sister and a daughter-in-law, she made it a point to state that she intended her sons to have the property. She emphasized such intention by adding that she did not intend the stepsons to have any interest in the property. *Delivery was reflected by recordation of the deed and deposit by Della in the safety deposit box with written authority that any of the grantees, who also were tenants under the box rental agreement, had exclusive right of access to the box.*

(Emphasis supplied.) *Id*.

The primary issue in *Meadows v. Brich*, 606 S.W.2d 258 (Mo. App. 1980), was whether the trial court was correct in finding that a deed had been delivered. In making that determination, the court stated the following governing principles, with which we agree:

> Whether or not a deed has been delivered is a mixed question of law and fact. The element which controls the resolution of that question is the intention of the parties, especially the intention of the grantor. The vital inquiry is whether the grantor intended a complete transfer—whether the grantor *parted with dominion over the instrument* with the intention of relinquishing *all* dominion over it and of making it presently operative as a conveyance of the title to the land.

> It is not necessary, to effectuate delivery, that the deed actually be handed over to the grantee or to another person for the grantee. There may be a delivery notwithstanding the deed remains in the custody of the grantor. If a valid delivery takes place, it is not rendered

ineffectual by the act of the grantee in giving the deed into the custody of the grantor for safekeeping. It is all a question of the intention of the parties, which may be manifested by words or acts or both.

If the deed, although acknowledged, is not recorded and is in the grantor's possession at the time of his death, those circumstances, unless explained, are deemed conclusive that the parties did not intend a complete transfer. If there is an unequivocal showing that the grantee was given possession of the deed, a presumption of delivery arises. Such a presumption, however, does not arise where the evidence shows that the grantor handed the deed to one of two grantees momentarily, for the purpose of reading it, and at the grantor's direction it is immediately taken back into grantor's possession, to be kept by him until his death.

There is a presumption of *non-delivery* if the evidence shows that the deed was in grantor's possession at the time of his death and was not then recorded. Such a showing places upon grantees the burden of going forward with the evidence, "more accurately, the burden of persuasion," to rebut the presumption of non-delivery.

*Id.* at 260.

The parties seem to agree that it was Agnes who decided that the Urbanek farm would be put in Joe's name originally, and it was Agnes who decided that Joe should add Martha's name to the deed. Thus, it is difficult to ascertain the *grantor's* intent. However, as noted in *Moseley v. Zieg*, 180 Neb. 810, 146 N.W.2d 72 (1966), the burden of proof rests upon the party asserting delivery to establish it by a preponderance of the evidence, and to constitute a valid delivery of a deed there must be an intent on the part of the grantor that the deed shall operate as evidence of title to take effect presently. Therefore, Martha had the burden of proof to show that Joe had the intention to relinquish dominion over the deed and to make it *presently* operative as a conveyance of the title to the land.

In deposition testimony, Martha stated:

Q. After Joe died, did you get a deed to the Urbanek place?

A. Yes.

Q. How?

A. It was written in Joe's name. When he passed away, it was deeded to me.

Q. Well, but how did you get the deed?

A. It was made at the Schuyler Bank with Mr. Joe Beck when — well, the farm was Joe's, and after something happened to him, then it would be mine.

. . . .

Q. Did you record the deed?

A. No.

Q. Do you know what it means to record a deed?

A. Yes.

. . . .

Q. But you didn't record it?

A. No.

Q. Who did?

A. Nobody. Joe had it at home. He had it.

Q. In what?

A. In the dresser drawer, and it was there until —

Q. Until he died?

A. Until he died.

Martha further testified:

A. Well, then that Urbanek's, it was an estate. So we decided to buy it because it was just a mile and a half from the home place where I come from.

Q. Did anybody make any decisions about how it was going to be paid for?

A. We all pitched in.

Q. Joe and Jerry and Mom and you, right?

A. Yes.

Q. And the title was put in Joe's name?

A. Yes.

Q. How did you get your name on that title?

A. I don't know which year now, but then Mother decided — Well, it was with Dad's estate. The farm was put in just Dad's name and not in Mother's, and so we had it made that Urbanek's place, which Joe had in his name, *so it would be willed to me*, something should happen to

him.

Q. Why was that?

A. Mother decided it that way.

. . . .

Q. After your mother died, did Jerry rent this farm from you for awhile?

A. *I did not have no right to the farm until after Joe passed away.*

(Emphasis supplied.) This testimony clearly evidences the testamentary intent of the deed as to Martha.

Although factually distinct in that the grantor was not a cograntee, in *Moseley v. Zieg, supra,* we found that where an unrecorded deed was found after the grantor's death, in a safe deposit box to which the grantee had a right of access as a joint lessee with the grantor, this of itself would not sustain a finding that the deed was delivered when the grantor retained control, collected rents, and made repairs on the property, as he did before the purported delivery. On rehearing, in *Moseley v. Zieg,* 181 Neb. 691, 692, 150 N.W.2d 736 (1967), we reexamined the evidence and again concluded that there had been no delivery, noting that "the facts show an attempted testamentary disposition of the property, which can only be done by compliance with the will statute."

It is essential to the validity of a deed that there must be delivery, and the burden of proof rests upon the party asserting delivery to establish it by a preponderance of the evidence. *Moseley v. Zieg,* 180 Neb. 810, 146 N.W.2d 72 (1966). It is true that *Moseley* states that when the deed is found in the grantee's possession during the lifetime of the grantor, this is prima facie evidence of delivery, and the burden of proof is upon the one who disputes this presumption. However, here, the deed was never in Martha's possession during Joe's lifetime.

We find that there is insufficient evidence to support a conclusion that the deed from Joe to Joe and Martha was delivered to Martha during Joe's lifetime. Accordingly, there is no valid title in the Cihals upon which a trust may be impressed. To that extent, the judgment of the district court finding that the Brteks have failed to prove the establishment of a trust as to the Urbanek place is affirmed. By the same token, we reverse

the judgment of the trial court which confirmed title to the Urbanek place in the Cihals.

Rather, we find that at Joe's death without a will, title vested immediately in his heirs or heir. "Where an ancestor dies intestate his lands descend instantly to his heirs. It does not require settlement of his estate or a probate order declaring heirship to vest his title." *Noell v. Noell*, 214 Neb. 632, 635, 335 N.W.2d 303, 306 (1983). There is no question that Joe died in 1974, leaving no spouse or issue surviving him, so title descended to his mother, Agnes. Effective at that time was Neb. Rev. Stat. § 30-102 (Reissue 1964), which provided in substance that upon the death of one leaving no spouse or heir surviving, his or her property descended to parents if living. Accordingly, title descended to Agnes. Upon Agnes' death in 1982, in effect at that time was Neb. Rev. Stat. § 30-2303(1) (Reissue 1979), which provided that upon the death of a person leaving no spouse surviving, the estate passes to "the issue of the decedent . . . ." This, of course, would mean Jerry and Martha. Although this is not the lawsuit that was tried, nevertheless, the evidence supports such a conclusion. "[W]here a court of equity has obtained jurisdiction of a cause for any purpose, it will retain it for all, and will proceed to a final determination of the case, adjudicating all matters in issue, thus avoiding unnecessary litigation." *Whitehead Oil Co. v. City of Lincoln, ante* p. 680, 682, 515 N.W.2d 401, 405 (1994). Therefore, title is confirmed in Jerry and Martha as tenants in common, and the deeds to the Urbanek place purporting to vest title in Martha and then Martha and Lad are ordered canceled of record. There is no problem with the statutes of limitations, because the deed to Martha was not valid and she had no title to convey to herself and Lad. The judgment of the district court confirming title to the Urbanek place in Martha and Lad Cihal is reversed.

## THE PEDERSEN PLACE

The Brteks argue in regard to the Pedersen place that a constructive trust should be imposed.

A constructive trust is imposed when one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the

property. In such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof. *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990); *Ford v. Jordan*, 220 Neb. 492, 370 N.W.2d 714 (1985).

A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the grounds that his acquisition or retention of the property would constitute unjust enrichment. *Gottsch v. Bank of Stapleton, supra*; *Knoell v. Huff*, 224 Neb. 90, 395 N.W.2d 749 (1986).

Generally, a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. *Gottsch v. Bank of Stapleton, supra*; *In re Estate of Lienemann*, 222 Neb. 169, 382 N.W.2d 595 (1986).

A party seeking the remedy of a constructive trust has the burden to establish the factual foundation, by evidence which is clear and convincing, required for a constructive trust. *Gottsch v. Bank of Stapleton, supra*; *Lone Oak Farm Corp. v. Riverside Fertilizer*, 229 Neb. 548, 428 N.W.2d 175 (1988).

The record simply does not support a conclusion that the Cihals "had obtained title to [this] property by fraud, misrepresentation, or an abuse of an influential or confidential relationship," *In re Estate of Lienemann*, 222 Neb. at 177, 382 N.W.2d at 601, and the district court was correct in declining to impose a constructive trust.

We next examine the requirements for a resulting trust, which was argued by the Brteks as to the Urbanek place, but not as to the Pedersen place.

The court will impose a resulting trust when the circumstances surrounding a conveyance make it clear that the parties intended such a result. *Superior Hybrids Co. v.*

*Carmichael*, 214 Neb. 384, 333 N.W.2d 911 (1983).

A resulting trust has been defined to be one raised by implication of law and presumed always to have been contemplated by the parties, the intention as to which is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance. *Superior Hybrids Co. v. Carmichael, supra*; *Biggerstaff v. Ostrand*, 199 Neb. 808, 261 N.W.2d 750 (1978).

With respect to the underlying issues involving a resulting trust, the rules in this state have been well established. Where a transfer of property is made to one person and the whole or a part of the purchase price is paid by another, a resulting trust arises in favor of the person by whom such payment is made. *Superior Hybrids Co. v. Carmichael, supra*; *Jirka v. Prior*, 196 Neb. 416, 243 N.W.2d 754 (1976).

The rationale for this rule is that individuals seldom give consideration to receive nothing. *Superior Hybrids Co. v. Carmichael, supra*; *Campbell v. Kirby*, 195 Neb. 610, 239 N.W.2d 792 (1976).

The burden is upon the one claiming the existence of a resulting trust to establish the facts upon which it is based by clear and satisfactory evidence. *Superior Hybrids Co. v. Carmichael, supra*; *Biggerstaff v. Ostrand, supra*.

Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984).

As stated in *Superior Hybrids Co. v. Carmichael*, 214 Neb. at 387, 333 N.W.2d at 913: " 'Where a transfer of property is made to one person and the whole or a part of the purchase price is paid by another, a resulting trust arises in favor of the person by whom such payment is made . . . .' " Although a resulting trust may not arise when the parties are sufficiently close so as to give rise to a presumption that a gift was intended, that presumption can be rebutted.

When the Cihals purchased the Pedersen place by contract with Walter and Isabelle Pedersen dated July 12, 1963, there seemed to be no question that they were buying this farm as their own. They obtained the deed on December 23, 1963, and

filed it for record that same day. The Cihals made payments to the Pedersens as follows:

| | |
|---|---|
| 7/12/63 | $ 1,000.00 |
| 12/23/63 | 23,000.00 |
| 12/28/64 | 2,940.00 |
| 12/27/65 | 302.50 |
| 12/30/66 | 1,302.50 |
| 12/29/67 | 1,745.50 |
| 12/31/68 | 3,165.00 |
| Total | $ 33,455.50 |

It was not until February 1968 that the Brteks ever suggested that an agreement was made between the Brteks and the Cihals for the sale of the Pedersen place to the Brteks. At that time, the Cihals had been the record titleholders and in possession for over 4 years.

The Brteks have not established by clear and convincing evidence that when the conveyance was made to the Cihals, the intention was that the farm was being purchased for the Brteks, and therefore, no resulting trust arose.

Whether the Pedersen transaction between the Brteks and the Cihals was intended to be a loan or gift to, or a sale from, the Cihals was not raised by the pleadings or argued in the briefs. Whether those issues can be decided under a prayer for general equitable relief we need not answer, because either claim would be barred by the statute of limitations.

Neb. Rev. Stat. § 25-202 (Reissue 1989) provides in part: "An action for the recovery of the title or possession of lands, tenements or hereditaments, or for the foreclosure of mortgages thereon, can only be brought within ten years after the cause of action shall have accrued . . . ."

An action "upon a contract, not in writing . . . can only be brought within four years." Neb. Rev. Stat. § 25-206 (Reissue 1989).

A cause of action in contract accrues at the time of the breach or failure to do the thing agreed to. *Hooker and Heft v. Estate of Weinberger*, 203 Neb. 674, 279 N.W.2d 849 (1979).

Assuming the transaction regarding the Pedersen place was either a contract of sale or a failure to repay a loan, the Cihals

would have been obligated to either execute a deed or repay the loan within a reasonable time after the final payment made by Agnes, Joe, and Jerry. The final payment made to the Cihals of any money related to the Pedersen transaction was February 26, 1974. This action was filed on September 9, 1986, more than 12 years 6 months after either action would have accrued.

It seems to be Jerry's position that his cause of action did not arise until sometime in 1985, when he and Martha got into an argument about title to both the Urbanek and Pedersen places. Under cross-examination by the Cihals' attorney, Jerry said that Martha told him in 1968 she would be giving him the deed to the Pedersen place, but that she refused to do so. On redirect by his own attorney, when asked what Martha had told Jerry about the deed to the Pedersen place, Jerry answered, "[T]hat she would make it right with me, that she will eventually some day. I haven't seen that day today, to this day I ain't got the title." During Jerry's examination by his own attorney, he produced a letter written by Martha and mailed to Jerry's wife, postmarked April 14, 1972, which in part stated:

> Received your letter & was quite disappointed. We are doing the best we can. [T]he farm up the hill is ours. [I]t cost us $32000.00 and I can not sign it over to you. I gave permission that you could live there. [T]hat is I don't know how it will be yet.

It seems to be the Brteks' position that during the next 12 years, Jerry kept waiting for this performance, and therefore, his action had not accrued. However, that did not toll the running of the statute. On the record before us, we must conclude that the statute of limitations had expired before this action was filed in 1986. Accordingly, that portion of the judgment of the district court confirming title to the Pedersen and Texel places in the Cihals and the home place in the Brteks is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED.