ELENA F. SCHMIDT, APPELLANT, V. MERLIN C. FEIKERT
AND JANENE M. FEIKERT, HUSBAND AND WIFE,
AND THE LOYAL W. SHEEN FAMILY TRUST, APPELLEES.

631 N.W. 2d 537

Filed July 17, 2001. No. A-00-832.

Gregory C. Damman, of Blevens & Damman, for appellant.

Kent A. Schroeder and Vikki S. Stamm, of Ross, Schroeder & Romatzke, for appellees.

HANNON, INBODY, and MOORE, Judges.

HANNON, Judge.

## INTRODUCTION

Elena F. Schmidt appeals the trial court's denial of her petition to set aside a deed conveying real estate from a trust, of which Elena is a beneficiary, to her brother-in-law and sister, Merlin C. Feikert and Janene M. Feikert. In this appeal, Elena maintains the trial court erred in determining that the deed was delivered with intent to transfer the property. We find that the deed was not delivered in the legal sense and therefore must be set aside as void and ineffective. Accordingly, we reverse, and remand with directions to enter a decree canceling the deed in question.

## BACKGROUND

Loyal W. Sheen and Veona G. Sheen were husband and wife. They had three children: Elena, Allan Sheen, and Janene. On January 17, 1979, Loyal created the Loyal W. Sheen Family Trust in which he and Veona conveyed real property, including the property which is the subject of this litigation. The trust was irrevocable, but it appears that it was created with the thought that Loyal and Veona could continue to do whatever they wished with the trust property, even though the trust document does not so provide. The trust was apparently intended to pass the trust estate in undefined amounts to Loyal and Veona's children, but apparently a 1981 action in the county court for Buffalo County was thought to be necessary to clarify that the children as well as Loyal and Veona were beneficiaries. Loyal died on August 18, 1982.

The trust document provided for two trustees at all times, giving them broad powers to sell and manage the trust assets. For many years after Loyal's death, Veona and Elena were the trustees. The trust assets were used to benefit the family. Trust land had been sold to Elena and her husband in the 1980's, and trust assets had been used to pay substantial debts of Allen. Before Elena purchased the land from the trust, she paid

approximately $100 to $150 per month in rent. The Feikerts have lived on the real estate that is the subject to this litigation since 1981 without the payment of rent and with the trust paying the taxes and insurance. For many years, there had been discussion within the family about the Feikerts' purchasing this property from the trust. It is clear that the trust assets were used by Veona and the children to benefit the children in ways which they, but principally Veona, thought advisable and fair between them. In short, the trust assets were used in about the same way that propertied parents frequently use their assets to benefit their adult children by either gifts, rent free use of real estate, advantageous sales of property to them, or payments of debts. Apparently, this family was close and got along well, until the problem involved in this litigation arose. After this litigation began, Veona and Elena were removed as trustees by the court in a separate proceeding. It is not clear who the subsequent trustees were, but it is evident from the record that one of them was an accountant. At trial in this case, Elena admitted that before she and Veona were removed, they had spent more than $10,000 of trust assets to remodel Elena's home.

Richard Gee, an attorney who practices law in Grand Island, Nebraska, but who did not draft the original trust, acted as the trust's attorney for a number of recent years. In 1981, Gee brought the action in county court to obtain the modification of the trust agreement to name the children as beneficiaries, and he had prepared a deed in 1988 when the trust sold real estate to Elena and her husband.

In May 1993, Merlin telephoned Gee and told him Veona had agreed to sell him the "farm," which was understood to be the land upon which they were living. Merlin asked him to prepare a warranty deed for the sale of the property by the trust to the Feikerts. Gee had no memory of having talked to Veona at that time about the sale, and at that time, he did not know the details of the purchase price, but he knew the Feikerts were going to pay something for the land.

Gee prepared a warranty deed for the signatures of Veona and the three children to convey the "farm" to the Feikerts as joint tenants. The deed stated the consideration was $1 and other valuable consideration. Gee obtained the description from

information he had in the office, but at trial, it was clear that he had erred in that he used a description that included only the abutting acreage and not the parcel upon which the house was situated. All of the designated signers were identified on the deed as trustees notwithstanding the fact that only Veona and Elena were trustees at the time. Gee testified that he did this because an attorney representing the buyer of other trust property had insisted upon this procedure.

Gee sent the deed to the Feikerts with a cover letter dated June 28, 1993, which stated simply: "Here is the deed, ready for signatures. After it is signed, take it to the Courthouse for registering." Over the course of the next year, Merlin personally acquired the signatures of Veona, Elena, Allen, and Janene. He then returned it to Gee, who notarized the signers' signatures in one prepared acknowledgment. The deed recites that it was executed on "5-25-94," and Gee testified that he acknowledged the signatures of all the signers. Gee admitted that he had neither seen the grantors sign the document nor did they acknowledge their signatures to him in any manner. Gee testified that he then mailed the deed back to Merlin. Gee also testified that he remembered having prepared the deed in June 1994, not 1993, but he testified that he acknowledged the deed on May 25, 1994. He persisted in this testimony in spite of the evidence on his cover letter, mailed with the unsigned deed to Merlin, which was dated June 28, 1993, and in spite of a statement in evidence from Gee to Veona dated July 6, 1994, which lists a charge of .40 hours and a notation which stated, "6/10/94 Talked to son-in-law about notarizing the deed. Later in the afternoon he brought it in and I notarized it." This evidence plus the testimony of the Feikerts clearly established Gee was in error. The evidence is clear that the deed must have been prepared in June 1993 at about the time of Gee's letter and that Merlin personally returned it with the grantors' signatures on June 10, 1994. This point is not controlling on the outcome of the litigation, but we find these facts are clearly established. Gee also testified that he was aware that Merlin was going to take the deed rather than a sales contract to the bank to acquire a loan. Later, after Veona called him, he also learned she had asked Merlin to return the deed, but he had refused.

Whom Gee was representing in these matters is not clear. He sent a statement to Veona for his charges in preparing the deed, but Merlin testified that after Veona received the statement, she told him or Janene that part of the bill was theirs because part of it was for Merlin's visit with Gee. The Feikerts paid the $28 designated in the bill for the conference on June 10, 1994, but they did not pay the remainder designated as previously billed.

Merlin recorded the deed on July 5, 1994. The real estate transfer statement Merlin signed when he recorded the deed showed the purchase price to be $25,000. At Gee's suggestion after Veona learned that the deed had been recorded, Gee prepared an affidavit for Veona's signature, which she signed and recorded with the register of deeds, in which she stated that the deed should not have been recorded because the grantees had not paid the purchase price. Upon learning of this affidavit, the bank refused to go through with the loan to the Feikerts.

Elena testified that some time prior to May 25, 1994 (she does not remember the date more clearly), Merlin called and said he was bringing a paper over so he could begin paying for the property. He arrived at her home 5 or 10 minutes later. She testified that they had no agreement at the time she signed the deed, and she was never present at any discussion between Veona and the Feikerts regarding the purchase price. After signing the deed and as Merlin stepped out the door, Elena asked, "[B]y the way, how much are you paying for the property?" Merlin responded, "$25,000." She also testified that she thought the Feikerts were only purchasing the house and not the whole property. She denied agreeing to the $25,000 purchase price, or of being aware of any agreement on the purchase price of the property. She testified that in her opinion, the house was worth more than $25,000, and that after Merlin left, she tried to contact Veona to learn what was agreed to.

Janene was called as a witness during Elena's case in chief. Janene testified that $25,000 had been agreed upon as the consideration for the property. She testified that she and Merlin had made an application for a bank loan and that the filing of Veona's affidavit saying the deed had been improperly recorded prevented the closing of that loan and therefore prevented them from paying the agreed upon price. Janene testified that she had

a conversation with Veona in 1988 and that she understood Veona was representing the trust. In support of her conclusion, she testified that Veona had told her she wanted to be fair between her children and that Veona "told [her] how much [she] would be offered [their] land for." Janene understood this to be $25,000. Veona told her they needed to get the land appraised just as Elena had done when she purchased her land from the trust. Janene was asked if she understood that "the purpose of the deed in 1994 was to obtain financing so that [the Feikerts] could purchase the property." She answered yes, and when they received the letter from Gee with the deed, they read the letter and followed it.

In the defendants' case in chief, Janene testified that she had a conversation with Elena years before and that Janene understood "we were in agreement." However, upon further examination, she testified that she did not recall what the purchase price was when they were discussing the matter. Upon examination by the judge, she testified that she "believed" she and Veona had agreed to a purchase price of $25,000. Janene also testified that when she and Elena had spoken previously, Elena did not disagree with that price.

Janene further testified that Gee sent the unsigned deed to Merlin on June 28, 1993, and that they took until May 1994 to obtain the signatures because they were busy with other matters and felt no urgency to close the land purchase. She and Merlin took the deed to the bank in May and then again in June in an attempt to acquire financing. She testified that they were unable to close until they got "the affirmation of that deed from all the beneficiaries and trustees." She testified that they were ready to close if the title requirement had been met.

Merlin testified that the only time he was present when the purchase price was discussed was the time that he talked to Veona prior to calling Gee. He testified that he "wanted to make sure that [it] was still okay with Veona that we could purchase it for 25." He personally circulated the deed and saw each of the signatories sign it. He testified that he stopped by Gee's Grand Island office and that Gee notarized the signatures. The deed could have been dated on this date, June 10, 1994, but Merlin told Gee the last person to sign the deed, Allen, did so on May

24, 1994, and Gee dated the deed as of that date. Merlin also testified that he and Janene intended to borrow $30,000 on the property and use the extra $5,000 to replace the air conditioner and for other improvements.

In Elena's operative petition, she alleged facts in support of theories that the deed was not properly acknowledged, that it lacked sufficient consideration, and that it was obtained by fraud and misrepresentation. In the trial judge's written opinion, he denied relief on the basis of all three theories, but did not discuss or make a finding on the subject of delivery. In this court, Elena alleges the trial court erred in finding that the deed was delivered with the intent to transfer ownership of the property. The appellees' brief mentions several matters which might support an affirmance, including a claimed prior adjudication and failure of the court to sustain a demurrer ore tenus. However, the appellees did not cross-appeal, and therefore we do not consider these matters.

## ASSIGNMENT OF ERROR

Elena alleges the trial court erred in finding that the deed had been delivered with the intent to transfer ownership of the property. In oral argument, the appellees argued in part that nondelivery was not alleged in the operative petition. Nondelivery was not so alleged in specific words, but the petition alleged facts which dispute delivery in the legal sense, such as that the grantors did not relinquish control of the deed, that the deed was only prepared to allow the Feikerts to obtain financing, that counsel was not given authority to deliver the deed to the Feikerts, and that Elena signed the deed with no intention that it would be a conveyance. We therefore conclude that the issue of delivery in the legal sense is adequately pled and that this issue was before the trial court and is now before this court as Elena's sole assignment of error.

## STANDARD OF REVIEW

An action to set aside a deed sounds in equity.

In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give

weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

*Lincoln Lumber Co. v. Lancaster*, 260 Neb. 585, 589, 618 N.W.2d 676, 679-80 (2000).

 "On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below." *Prochaska v. Douglas Cty.*, 260 Neb. 642, 643, 619 N.W.2d 437, 439 (2000).

## ANALYSIS

 The Feikerts obtained physical custody of the deed, but the issue is whether the deed was delivered in the legal sense.

There is no question but that a deed, to be operative as a transfer of realty, must be delivered. The controversial questions are those concerning the sufficiency of the facts relied upon to establish delivery. . . .

There is a vital distinction between the use of the word "delivery" as simply designating the transfer of physical custody or possession of a deed, and the use of the term in the legal sense.

23 Am. Jur. 2d *Deeds* § 120 at 155 (1983). The above statement is merely a different means of expressing the rules recognized by the Nebraska Supreme Court:

This court, in the case of Lewis v. Marker, 145 Neb. 763, 18 N.W.2d 210, laid down the following rules in its syllabi which we deem applicable to the case before us: "It is essential to the validity of a deed that there be a delivery and the burden of proof rests upon the party asserting delivery to establish it by a preponderance of the evidence.

"To constitute a valid delivery of a deed there must be an intent on the part of the grantor that the deed shall operate as a muniment of title to take effect presently.["]

*Moseley v. Zieg*, 180 Neb. 810, 815-16, 146 N.W.2d 72, 76 (1966). See, also, *Brtek v. Cihal*, 245 Neb. 756, 515 N.W.2d 628 (1994).

 The possession of a deed by the grantee, in the absence of opposing circumstances, is prima facie evidence of delivery, and the burden of proof is on the person who disputes this

presumption. *Cerveny v. Cerveny*, 154 Neb. 1, 46 N.W.2d 632 (1951); *Kellner v. Whaley*, 148 Neb. 259, 27 N.W.2d 183 (1947). This presumption is not conclusive, but it raises a strong implication which can only be overcome by clear and satisfactory proof. *Cerveny, supra*. The Feikerts had possession of the deed and therefore have the benefit of that presumption. However, in view of the substantial direct evidence in this case, the presumption is adequately rebutted. " ' "No particular act or form of words is necessary to constitute a delivery of a deed. Anything done by the grantor from which it is apparent that a delivery was intended, either by words or acts, or both combined, is sufficient." ' " *Cerveny*, 154 Neb. at 7, 46 N.W.2d at 635-36. See, also, *In re Estate of Saathoff. Saathoff v. Saathoff*, 206 Neb. 793, 295 N.W.2d 290 (1980); *Milligan v. Milligan*, 161 Neb. 499, 74 N.W.2d 74 (1955).

"[T]he essential fact to render delivery effective always is that the deed itself has left the control of the grantor, who has reserved no right to recall it, and it has passed to the grantee." *Brtek*, 245 Neb. at 765, 515 N.W.2d at 635. Accord, *Robinson v. Thompson*, 192 Neb. 428, 222 N.W.2d 123 (1974); *Kellner, supra*. " ' "It is sufficient if the grantor delivers it to a third person unconditionally for the use of the grantee, the grantor reserving no control over the instrument." ' " *Robinson*, 192 Neb. at 430, 222 N.W.2d at 125 (quoting *Milligan, supra*). See, also, *Brunson v. Kahler*, 176 Neb. 735, 127 N.W.2d 281 (1964).

" 'Whether or not a deed [or other instrument conveying an interest in property] has been delivered is largely a question of intent to be determined by the facts and circumstances of the particular case. . . .' " *Saathoff*, 206 Neb. at 800-01, 295 N.W.2d at 296 (quoting *Milligan, supra*). Accord *Brtek, supra*.

> "Whether or not a deed has been delivered is a mixed question of law and fact. The element which controls the resolution of that question is the intention of the parties, especially the intention of the grantor. The vital inquiry is whether the grantor intended a complete transfer—whether the grantor parted with dominion over the instrument with the intention of relinquishing all dominion over it and of making it presently operative as a conveyance of the title to the land.["]

(Emphasis omitted.) *Brtek,* 245 Neb. at 767, 515 N.W.2d at 636-37.

We consider the facts in evidence with the above rules in mind. When the last trustee physically delivered the deed to Merlin, the deed was not yet signed by Allen, whose signature was probably unnecessary, but nevertheless, the document was prepared to include his signature. Even when the deed had been signed by all of the parties for whom it was prepared, and an acknowledgment placed upon it, there was no act which could be termed a delivery of the document to the grantees with intent to convey the real estate. There is no showing that Gee was authorized by the trustees to deliver the deed for them, or even that he was representing the trustees in the sale of the real estate.

More importantly, none of the parties thought the conveyance was to be a gift without consideration. The Feikerts maintain the agreed consideration was $25,000. At one point, Janene testified the agreed upon consideration was $25,000, but her later testimony amounts to a statement that she "believed" or understood the agreed upon consideration to be $25,000. To support her understanding, she relies upon a 1988 conversation with Veona and a conversation with Elena several years prior to the signing of the deed, in which conversations $25,000 was mentioned. Elena does agree with Janene's version of events, but the strongest Janene goes in her statement is that during her conversation with Elena, Elena did not disagree to that price. Merlin testified only that he called Veona before having the deed prepared to see if they could purchase it for $25,000. Further, the evidence shows Elena only learned of the purchase price after she signed the deed, and only then by asking Merlin what the Feikerts were paying for the property. Under the trust document, the trustees had the authority to sell the property, but the evidence does not show they had agreed to do so.

We realize any agreement to sell the land to the Feikerts would have to be in writing to be binding. See Neb. Rev. Stat. § 36-105 (Reissue 1998). However, assuming the deed was in fact delivered, any oral contract to sell the real estate would have been performed and the statute of frauds would not apply. However, the evidence does not show that the parties had even orally agreed to be bound to buy and to sell the real estate. There

was only a general notion among members of the family that the Feikerts were to be able to buy the real estate. Discussion was had about the consideration, and the Feikerts believed an agreement was reached, but not even their own evidence adequately supports a finding of an agreement. The lack of an agreement weighs heavily on the issue of delivery.

The most compelling aspect of the situation is that the evidence shows the deed was conditionally delivered. Gee testified that Merlin was going to take the deed rather than a contract to the bank to see if he could get a loan. Janene testified that they took the deed to the bank in an attempt to get financing. The signed deed was in the Feikerts' possession in late June 1994, and the prepared truth-in-lending documents were dated for an August 19 loan closing. They took the deed to the bank in the interim. There is no claim by the Feikerts that they were bound to pay for the land, but, rather, they were merely trying to raise the money, that is, they do not testify that they purchased the property unconditionally, but, rather, that they used the deed, as Gee testified they intended to use it, to obtain financing to purchase the property.

We find no Nebraska case which considers this situation, but general authority and other states have considered it.

> [W]here a deed is deposited with the grantee for a purpose other than a delivery, it does not operate as a conveyance; as where he . . . has taken it for the purpose of examination . . . . The handing of a deed to a grantee with the intention of the parties that the deed is not to become operative immediately, or for retention by him pending his determination to accept it, does not constitute delivery.

26 C.J.S. *Deeds* § 42 (1956).

> The rule that where a deed is delivered to the grantee, but upon condition, the delivery is good and the condition is a nullity, has no application where the circumstances negative any intention to deliver the deed even conditionally. Thus, where, in giving the grantee possession of a deed, the intention is merely that he examine or read the deed or transmit it to a third person for a particular purpose . . . there is no legal delivery of the instrument which will pass title to the property.

23 Am. Jur. 2d *Deeds* § 135 at 165-66 (1983).

■ In *Curry v. Colburn and wife*, 99 Wis. 319, 74 N.W. 778 (1898), the deed was given to the grantee so he could take it to his lawyer for examination. The court in *Curry* stated that a deed is never effective until it is delivered with the intent to pass title, and to constitute a valid delivery, the grantor must part with his or her dominion with intent to pass title. Since delivery was not made with the intent to pass title, it had not been delivered. In *Bell v. Rudd*, 191 S.W.2d 841 (Tex. 1946), the grantor delivered an oil lease to the grantee so he could take it to his attorney and determine whether title was good, and if it was satisfactory, the buyer was to pay the consideration within 10 days. In less than the 10 days, the grantors renounced the sale, and the sale was held ineffective because the delivery had been conditional. In support, the *Bell* court cited what appears to be the 1946 version of the American Jurisprudence 2d material we quoted above.

It is clear and undisputed that the trustees did not deliver or authorize an unconditional delivery of the deed to the Feikerts. Therefore, there was no delivery, and the deed must be held to be void as a conveyance of the real estate. We therefore reverse, and remand the action with directions to enter an order in accordance with this opinion.

REVERSED AND REMANDED
WITH DIRECTIONS.