Blanche I. Light et al., appellants, v. Etta Ash et al.,
appellees.

115 N. W. 2d 903

Filed June 22, 1962.   No. 35156.

Edwin J. Myers, Frank E. Edgerton, and William L. Andrews, for appellants.

Carlos C. Schaper, Beatty, Clarke, Murphy, Morgan, Pederson & Piccolo, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, SPENCER, BOSLAUGH, and BROWER, JJ., and CHADDERDON, District Judge.

BROWER, J.

This is an action brought in the district court for Custer County by the plaintiffs and appellants Blanche I. Light and Allen Light, her husband, Fern Ellingson and Melvin Ellingson, her husband, and Alonzo Boyd Ash, against Etta Ash, Criss B. Ash and Frieda Ash, his wife, Etta Ash as administratrix of the estate of Alonzo B. Ash, deceased, and the Federal Land Bank of Omaha, a corporation, defendants and appellees.

Hereafter the parties will be referred to as plaintiffs or defendants, as they were designated in the trial court. Alonzo Boyd Ash will be designated as Boyd Ash, which name he generally used and to further distinguish him from his deceased father.

The action sought a judgment declaring and raising a constructive trust with respect to the title to two tracts of farm lands in Custer County. Plaintiffs prayed that the defendants Criss B. Ash and his wife Frieda Ash, and Etta Ash, who held and had held the legal title to the property, be found and adjudged to be trustees holding an equitable undivided one-fourth interest for each of the plaintiffs Blanche I. Light, Fern Ellingson, and Boyd Ash. It further sought a judgment requiring the defendant Criss B. Ash to pay or secure the discharge of a $4,500 mortgage placed on the premises by the defendants Criss B. Ash and wife, and Etta Ash in favor of the defendant Federal Land Bank of Omaha, or that said amount and mortgage be held to be a lien upon the remaining one-fourth interest in the premises

alleged to be in the defendant Criss B. Ash.

Before the trial of the cause in district court the defendant Etta Ash died and the action was revived as to her interest in the name of Criss B. Ash, special administrator of her estate. Likewise the plaintiff Fern Ellingson passed away and Melvin Ellingson, executor of her estate, was substituted as party plaintiff. The Federal Land Bank of Omaha filed a demurrer which was sustained and it was dismissed from the action. Allen Light appeared before trial and dismissed the action so far as he was concerned.

The factual situation from which this dispute grew arose in the following manner: Alonzo B. Ash, a farmer residing near Broken Bow, Nebraska, owned the two farms in question prior to his death. While he and his wife Etta Ash were visiting their son Criss B. Ash, who was then living in California, he died on December 24, 1937, intestate, leaving his widow Etta Ash and his children, the plaintiffs, Blanche I. Light, Fern Ellingson, and Boyd Ash, and the defendant Criss B. Ash, as his only heirs-at-law. His remains were brought back to Broken Bow for burial and the funeral was held there on December 29, 1937. On the morning of December 30, 1937, a meeting took place at the Ash farm home at which Etta Ash, the widow, and all of the children of the deceased, except Boyd Ash, who was then in Idaho, were present. A banker, T. T. Varney, and a lawyer, William C. Schaper, came to the home that day also and were present at the family gathering. Schaper brought with him a quitclaim deed to all the land and an assignment of all the personal property of the estate. In these instruments Etta Ash was grantee and assignee, respectively. The assignment contained a power of attorney naming Etta B. Ash as attorney in fact for the children of the deceased with respect to matters concerning the estate of Alonzo B. Ash. The deed and assignment were prepared for the signatures of the children then present and their spouses.

Both instruments were in the usual form and contained no reservation. The deed recited a consideration of $1 and love and affection and the assignment of love and affection only. They were executed by the children and their spouses at that time.

On the following day there was a meeting at the office of attorney Schaper. A similar deed for Boyd Ash and wife, Amber Ash, and a letter to Boyd Ash in Idaho were prepared by Schaper. According to the testimony of Schaper the letter was signed by all three children present, their mother, Etta Ash, and an uncle of the children, B. P. Ash. Boyd Ash who received it said to the best of his recollection it was signed by the three children and Frieda Ash, Allen Light, and the uncle. An unsigned carbon copy of it was identified and placed in evidence, the original not having been preserved. Its contents as far as pertinent is here set out:

"Dear Boyd: Mother has filed a petition to probate father's estate and is asking for her appointment as administratrix of the estate. Mr. Schaper and Mr. Varney were out home last night and we were all present when the petition for the probate of the estate was signed by mother. We have all signed a quit claim deed conveying our interest in the real estate to mother and we have all signed an assignment of interest in father's estate to mother. We have had Mr. Schaper prepare a quit claim deed for you and Amber to sign and also have had prepared an assignment of interest in father's estate for you to sign. The deed and the assignment of interest are identical with those which we have signed and delivered to mother, and we hope you will take the deed and the assignment of interest and you and Amber both sign these papers before a notary public and have your signatures witnessed and return these papers in the enclosed envelope to Schaper & Runyan, at Broken Bow.

"Now, Boyd, we all felt this was the proper thing to do, so that mother will have all of the estate to do with as she pleases as long as she lives. We sincerely hope

you will feel the same way about the matter and execute the papers prompty and mail them in the enclosed envelope. In addition to this letter we are writing you personally. As you will probably will know, this letter is dictated in the presence of all of us, but we will write separately."

The letter with the papers was duly sent to Boyd in Idaho. On January 5, 1938, Boyd Ash wrote and mailed a letter to Schaper & Runyan, the relevant portion of which is here set out:

"They write me there is no catch in my signing the quit claim deed. I realize that I am merely signing my rights from Dad to mother, but Mr. Schaper also I realize I am signing away my rights forever, (which is just what my mother wants) unless mother *chooses* to include me. Now, how well does she know that I am never to be included and besides just what will be left to be divided after she has deeded almost everything to Criss. It seems to me t'would be far more fair to have livestock & machinery divided, (not to own) to farm both places instead of Criss getting the use of machinery and all the livestock to farm both places.

"It has *always* been this way, Dad has always wanted to do what was fair (by me) (this is an awful thing to say) but my own mother would not let him. It has always been for Criss. Now all the reasons she would give for doing so I could name just as many."

On January 12, 1938, Schaper & Runyan answered. After explaining the presence of the family when the deed and assignment were signed it stated that his uncle had thought it best to have the letter signed by all. The letter contained the following paragraphs:

"Your mother has a friendly attitude toward you and at the present time has in mind that you two boys should later farm the places, and we believe you will get farther if you will take a cooperative attitude and work together with your mother and the family than if you retain an antagonistic attitude.

"It is true, however, that if you convey this property to your mother that you do so unconditionally and she could do with it as she pleases, but after all she is your mother and usually a mother will do the fair thing with her children. Every family at times has more or less differences but in the final annalysis (sic) the old saying that blood is thicker than water holds true. In all probability when you consider the circumstances you and your wife will not have any hesitancy in executing the papers and mailing them to us or your mother."

Boyd replied briefly on January 14, 1938, that he and his wife had decided on a settlement of the father's estate. Shortly thereafter Etta Ash, Blanche I. Light, and her daughter, and Criss and Frieda Ash made a trip to the residence of Boyd Ash at Fairfield, Idaho. Boyd hitched the team to the sled and got them from the place on the highway where they were stuck in the snow. After being there 4 or 5 days, Boyd Ash and wife executed a like quitclaim deed and assignment of the personal property of the estate of Boyd's father at Fairfield, Idaho, and delivered them to Etta Ash. The visitors left the day the papers were signed without returning to the ranch.

On October 19, 1953, Etta Ash deeded both farms to Criss B. Ash, reserving a life estate which was filed for record the same day. On February 2, 1953, she had made a will leaving everything to Criss except $1 for each of her other children and providing that any obligations owed by Boyd Ash to her should not be forgiven but should be collected by her executor. On June 10, 1959, Etta Ash died at the age of 87 years.

Approximately a year before his mother's death, Boyd Ash learned of the conveyance to Criss B. Ash and this suit was commenced.

Plaintiffs' petition set out the execution of the deeds and assignments. It further alleged in considerable detail that the deed and assignment executed on December 30, 1937, were procured by Etta Ash upon her oral as-

surances, promises, and agreement that she would retain the ownership of the property deeded and assigned during her lifetime, and neither deed nor mortgage them or permit any lien to be placed thereon; that she would manage and control the same, rent the same and collect the rents, pay the taxes and insurance, and maintain the buildings in good condition; and that upon her death the real estate and personal property would descend unencumbered to her four children Blanche I. Light, Fern Ellingson, Boyd Ash, and Criss B. Ash, share and share alike, together with any revenue therefrom not needed for the grantee's personal and living expense. It further alleged that the deed and assignment obtained on the trip to Idaho from Boyd Ash and wife were procured by means of similar oral representations and agreements to him; and that the oral promises, agreements, and representations of the defendant Etta Ash by which she procured said deeds and assignments were made by her with the fraudulent intent to deprive the plaintiffs of their share of their father's estate. It set out that they were induced to sign the same because of their love for the mother and their desire that she have the necessary rights and powers to manage the estate. It further set out that they believed their mother and accepted her promises, agreements, and representations in full faith and for that reason executed the deeds; that notwithstanding her solemn oral agreements and promises, Etta Ash executed the deeds to Criss B. Ash and thereby defrauded the plaintiffs and that the deeds to Criss were given for the purpose of defrauding them; that Criss B. Ash joined and confederated with his mother in an attempt to defraud the plaintiffs and in so doing well knew all of the promises and agreements of his mother; that plaintiffs did not discover the fraud until July 4, 1958, when they learned of said deeds to Criss; and that by reason of the complicity in the fraud of Etta Ash by Criss B. Ash, he and his mother are both estopped to deny the one-fourth

interest of each of the plaintiffs in said premises. Its prayer is to establish the constructive trust as heretofore mentioned.

The separate answers of Etta Ash and Criss B. Ash, so far as they are necessary to our decision, admitted the execution of the instruments set forth in the petition; denied the other allegations thereof; and set forth an indebtedness from Etta Ash to Criss B. Ash arising from the alleged furnishing of a home, care, and ministrations to Etta Ash in her old age. All affirmative allegations of the answers were denied by the plaintiffs' replies.

The matter proceeded to trial and at the conclusion of the evidence a motion to dismiss the plaintiffs' petition was made by counsel for defendants for the reason that the record and evidence were insufficient to sustain any judgment favorable to the plaintiffs. The court sustained the motion and dismissed the petition. Plaintiffs' motion for a new trial being thereafter overruled, they have brought their appeal to this court.

The general rules relating to constructive trusts have been quite clearly stated in decisions of this court. In Musil v. Beranek, 160 Neb. 269, 69 N. W. 2d 885, it was held: "When a person obtains the legal title to real estate belonging to another by means of fraud or. misrepresentation, actual or constructive, the law constructs a trust in favor of the party upon whom the fraud or imposition has been practiced. A court of equity will enforce such a trust for the benefit of the grantor or those claiming under him.

"Trusts arising by implication, or by operation of law, are excepted from the operation of the statute of frauds. Resulting and constructive trusts therefore fall within the exception.

"The existence of an intent to defraud at the time the promise was made may be inferred from the failure to comply with the promise, and the promisor may be presumed to have intended, when he made the promise, to do what he finally did do with respect thereto.

"The burden of proof is upon one seeking to establish the existence of a constructive trust to do so by evidence which is clear, satisfactory, and convincing in character."

The case of Box v. Box, 146 Neb. 826, 21 N. W. 2d 868, where a constructive trust was established laid down applicable rules in that case and of value here, stating: "If a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits, out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title.

"A constructive trust is a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property.

"In such cases the promise need not be express in order to raise a constructive trust, actual cooperation and silent acquiescence on the part of the grantee being sufficient where he has knowledge of the grantor's intention and understanding of the transaction."

In McCormick v. McCormick, 150 Neb. 192, 33 N. W. 2d 543, the court in speaking of trusts of this character, said: "So reluctant are the courts to engraft a trust by parol on the legal title to real estate that there is perhaps no better established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence.

"When the person to whom a conveyance of real property is made is the wife, who is the natural object of the husband's bounty, it raises a presumption of a gift or settlement rather than of a trust. This presumption

is rebuttable." On these same questions, see, also, Nelson v. Seevers, 143 Neb. 522, 10 N. W. 2d 349.

The plaintiffs make 19 assignments of error to the ruling of the court but the following are the only ones we deem it necessary to discuss. They are that the trial court erred (1) in holding the evidence was insufficient to establish a prima facie case in favor of the plaintiffs; (2) in not finding that the relationship between Etta Ash and her four children was of such a confidential relationship as to prove a prima facie case of constructive trust; (3) in refusing to permit the plaintiff, Boyd Ash, to testify as to statements made to him by the defendant Criss B. Ash in the presence of Etta Ash under the so-called dead man's statute, section 25-1202, R. R. S. 1943; and (4) in holding that any agreement or promise giving rise to a constructive trust or estoppel must have been made by Etta Ash alone, and that any statements, representations, or promises made by Criss B. Ash out of the presence of Etta Ash could not be considered as raising a constructive trust or estoppel against either Etta or Criss B. Ash.

At the time of trial death had stilled the voice of Etta Ash and the law had barred those of her children who were plaintiffs, the spouses of those residing in Nebraska, and the son-in-law Melvin Ellingson who had succeeded to the rights of his wife from speaking.

The evidence with respect to what was said, agreed to, or done, to induce the plaintiffs to execute the documents transferring the estate of Alonzo B. Ash to Etta Ash, his widow, was very brief.

As to the meeting at the farm home near Broken Bow on December 30, 1937, William C. Schaper, the attorney, was called by the plaintiffs. He was not questioned about what was said at the meeting. He identified some of the exhibits and stated he was asked to prepare the papers by T. T. Varney, president of the Broken Bow State Bank. He said at that time he supposed he acted as attorney for the whole family. He was sure he had

not been consulted by Criss B. Ash previously and didn't think he had been consulted by Etta Ash before. Nothing he said or was asked about tended to prove or disprove any oral agreement or promise that might have induced the execution of the deeds or assignments.

Allen Light, the husband of the plaintiff Blanche I. Light, was the only other witness to give evidence concerning this meeting. He was permitted to testify because he and his wife were residents of Colorado. This was done under the rule announced in Kiser v. Sullivan, 106 Neb. 454, 184 N. W. 93, holding such a spouse has no direct interest in the litigation. He testified that at this meeting on December 30, 1937, Schaper, the attorney, at the request of the banker Varney, arose to explain what had to be done to allow Etta Ash to go ahead. He read the paper they were asked to sign which the witness remembered as one document, and asked if others desired to read it. He said if they signed it would give Etta Ash the right to all the property and the rights of all the children. They couldn't then touch a thing as long as she lived. Etta Ash asked them to sign it and said that her hands were tied and she couldn't do anything. She then said that if they would only sign it she would take care of things as long as she lived and would see that they each got an equal share when she was through with it. Something was said about what would happen if Boyd refused to sign with them. The witness said he asked the question concerning this. Fern Ellingson asked what would happen if her mother married again, and the witness' wife Blanch I. Light, said to her, "Fern, can't you trust your mother?" The banker then recommended the mother's honesty and the mother again stated that if they would sign the paper she would take care of the property as long as she lived, increase it, try to double its value, pay the taxes, not allow a mortgage on the land, and would leave each of her children an equal share when she was through with it.

On cross-examination the witness failed to remember

several things that happened at that meeting, many of which he naturally might forget. There were things of importance however that it might be supposed he would have remembered. He stated he and his wife signed one paper only though his signature appears on both the deed and the assignment. He says he was never in Schaper's office and knew of no letter signed there. When asked to identify his own signature on the quitclaim deed that he signed with the others under his wife's signature, he testified: "Q Now, did you see your wife, Blanche I. Light, sign that deed that night, or that afternoon? My question is, did you see her sign this deed? A Is this a deed? Q Yes, sir. A All I can remember of is signing one paper, and all I can remember her signing is one paper. Now, if it's a deed, - I can't read, - but there was one paper we signed, and that's all I remember. Q Is that your signature that appears as the second signature on that Exhibit 10? A Can I get to more light? Well, I don't wish to answer that question, if possible, on account of I was asked not to. Q Okay. A But my lawyer — I done my best to prove something, but they don't want me to use this in this court, so I won't answer. That's one thing I can't answer. My name is on there; and if that isn't good enough — I ain't going to say that I signed it. Q Did you sign it? A I ain't going to say that I did, no."

The conversation in Idaho when the papers were signed by Boyd and his wife was testified to by Amber Ash, his wife, they being residents of Idaho. Her evidence was that the conversations took place in the kitchen of their home on the ranch near Fairfield, Idaho; and that they took place between her husband, Boyd, Criss B. Ash, and Etta Ash, who nodded her head and added a word here and there. The substance of the conversation as repeated by her was that Criss told her husband Boyd that the papers would have to be signed since Boyd's mother, Etta Ash, couldn't conduct business otherwise; and that she would take perfectly good care

of all her property and when she was through with it, it would be equally divided among her four children. Something was said about attorney's fees and that it would make it easier for the mother if the papers were signed. The mother said at that time that she didn't know what she would do if the papers were not signed. She was crying at different times during the conversation.

The foregoing was the only evidence received concerning anything said or done in the presence of Etta Ash on the trip to Idaho tending to show an agreement on her part to convey or devise any of the property to Boyd at her death. It is true that in certain cases the promise need not be express in order to raise a constructive trust and that silent acquiescence on the part of the grantee may be sufficient where one has knowledge of the grantor's intention and understanding of the transaction. Box v. Box, *supra*. This evidence therefore was admissible as tending to show an assent on the part of Etta Ash to the agreement outlined by Criss B. Ash in her presence.

The plaintiffs attempted to show by Boyd Ash a conversation between him and his brother Criss in the presence of his mother. It was apparently the same conversation as related by his wife. It took place at the same place with the same persons present. It was excluded by the trial court which ruled that the witness could not testify as to the conversation because of the so-called dead man's statute, section 25-1202, R. R. S. 1943, Etta Ash being then present. Thereupon, an offer of proof was made. It is evident from the offer that the conversation was the same to which his wife had already testified. Under the circumstances it would have been but corroborative. In view of our decision the only relevance or materiality of the offered testimony would be on the theory that Etta Ash sat mute when she should have spoken. Amber Ash had already testified that Etta Ash cried, nodded her head, and said

she did not know what she would do if Boyd would not sign the papers. In Pearson v. Bertelson, 244 Minn. 224, 69 N. W. 2d 621, the Supreme Court of Minnesota, with respect to the dead man's statute of that state, quoted and approved its former decision in these words: "In the Pomerenke case we said, (228 Minn. 263, 36 N. W. [2d] 708):

" '* .* * The all-inclusive coverage of this language is not to be evaded by dissecting a *conversation with* a decedent so as to allow testimony of what participants other than the decedent said and then to supply the import of decedent's contribution by a process of negation. A *conversation with* a decedent is not a one-sided affair in which only .what the decedent said is to be considered.' "

We think the trial court did not commit error when this corroborative testimony was excluded.

There was testimony by Boyd that out of the presence of Etta Ash there were conversations between him and his brother Criss on a hunting trip in which Criss and his wife Frieda Ash urged him to sign the papers. The inducements held out by Criss as shown by this testimony were different and more attractive than those previously mentioned by Criss in his mother's presence. According to Boyd, Criss told him if the papers were signed each of the boys would get a farm and the daughters each an equivalent amount of money. These were admitted for the time being over objections that the testimony was irrelevant and immaterial, but the court's statement in dismissing the petition makes it clear it did not consider them. Plaintiffs complain that Criss and his mother were conspirators and that these statements should have been considered as binding upon the mother but, in any event, as estopping Criss. The position of the plaintiffs is without merit. There is no pleading in the petition except by conclusions of law of a conspiracy or estoppel. Neither is a separate cause of action stated against Criss. He was made a party

because when action was brought he held title and it was asserted he had knowledge of his mother's fraud in which it was alleged he participated, had notice of, and by which he was estopped. There is no showing that Criss said or did anything when the papers were executed at the home in Nebraska. In Idaho he only urged making the conveyance to his mother. Any agreement with Criss to be binding on him as a separate agreement would not create a resulting or constructive trust but would be an attempt to create an express one, as he received nothing by the plaintiffs' conveyance. The express trust would under such circumstances be void as not in writing under the statute of frauds. Halsted v. Halsted, 169 Neb. 325, 99 N. W. 2d 384.

As we view the evidence the question before us is whether there is sufficient evidence to show an agreement on the part of Etta Ash to reconvey or devise the property in question to the four children on her death. The plaintiffs urge that the rule that if a defendant in an action in equity moves at the close of the evidence of the plaintiff for a dismissal of the action for want of proof to support a judgment, he admits the truth of the evidence and any reasonable conclusions deducible from it. Armbruster v. Stanton-Pilger Drainage Dist., 165 Neb. 459, 86 N. W. 2d 56. We do not feel that this rule abrogates or dispenses with the rule in this class of cases that the burden of proof is upon the one seeking to establish the existence of a constructive trust to do so by evidence which is clear, satisfactory, and convincing in character. Musil v. Beranek, *supra*.

The oral statements of the witness Light as to the meeting at the home in Nebraska on December 30, 1937, and of Amber Ash in Idaho, were made more than 20 years after the conveyances. The testimony of Light, though he does recite the agreement, is not very clear, satisfying, or convincing. His cross-examination, a portion of which is set out heretofore, is not conducive to establish credence in what he says. He was the husband

of a party and, though qualified to testify, his story is subject to scrutiny because of that fact. The documents in question were drawn by a lawyer. They contained nothing to show the conveyances were not absolute. The letter to Boyd, signed by all the next day, was drawn by the lawyer thereafter and no such agreement was recited therein. The plaintiffs point to the fact that the letter did say that execution of the papers was the proper thing to do "so that mother will have all of the estate to do with as she pleases as long as she lives." They contend it indicates she was not to have the property therefor after her death. It is not however indicative of the agreement described by Light that she was neither to deed nor to mortgage it. It says that she can do with it as she pleases. If the lawyer present at the conversation testified to by Light had heard and understood there was the agreement Light describes, it was his duty as a careful lawyer to fully describe it therein. The conveyance of a life estate could have been drawn without great effort and a lawyer would have seen the necessity of it. There is nothing to suggest that the lawyer was lacking either in ability or integrity. Boyd's letter to Schaper and Runyan, after receiving the letter signed by all the children, clearly shows he understood the papers to be an absolute conveyance. In their letter in reply Schaper and Runyan clearly point out they understood it as Boyd did. Boyd's last letter shows he still understood the conveyance to be absolute. Thereafter he executed conveyances that contained no new provisions and reserved nothing whatever. Indeed they seem from the exhibits to be those originally sent to him, both as to appearance of the exhibits from comparison with the prior documents, and the dates contained therein.

After these letters and after the explanation of Schaper and Runyan, the plain import and effect of these instruments is sought to be altered in material and important aspects after more than 20 years by oral testi-

mony. of one witness to each transaction, in each instance a spouse of a party, concerning conversations one of which was participated in by the grantee herself and the other by brief conversations of the brothers before their mother who is now deceased, at which time she only cried, nodded, and said she did not know what she would do if Boyd and Amber Ash did not sign. There is no showing of other circumstances or evidence that might substantiate the statements, either by word or deed.

The plaintiffs contend that, as stated in Restatement, Trusts, § 44, p. 137, in many instances a confidential relation exists not only between attorney and client, trustee and beneficiary, guardian and ward, and similar relationships, but also where because of family relationships the transferor is in fact accustomed to be guided by the judgment of the transferee or is justified in placing confidence and believes that the transferee will act in the interest of the transferor. In this case however, the children of Etta Ash were not shown to have been particularly close to her. They had lived for some time apart from her, were not home and did not see her often, and there was no showing that they were in the habit of depending on her judgment or looking to her for guidance in their business matters. Boyd quite clearly did not show that he relied on her or was under her influence.

A conveyance by children to their recently widowed mother under such circumstances would more likely be presumed a gift than a conveyance procured because of any fiduciary relationship raising a constructive trust.

It is because of the necessity of giving stability to written muniments of title that require courts of equity and good conscience to establish and decree constructive trusts only by clear, convincing, and satisfactory evidence.

The trial court found the evidence was insufficient to establish such a trust and to warrant a judgment in

favor of the plaintiffs, and with its ruling we are in accord.

The judgment is therefore affirmed.

AFFIRMED.