I. P. HOMEOWNERS, INC., A NEBRASKA CORPORATION, APPELLEE AND CROSS-APPELLANT, V. HAROLD RADTKE AND JUANITA RADTKE, APPELLANTS AND CROSS-APPELLEES.

558 N.W.2d 582

Filed January 7, 1997. No. A-95-1095.

Thomas F. Hoarty, Jr., and Christopher R. Hedican, of McGowan & Hoarty, for appellants.

Michael F. Pistillo and Thomas G. Incontro, of Pistillo & Pistillo, P.C., for appellee.

MILLER-LERMAN, Chief Judge, and HANNON and MUES, Judges.

HANNON, Judge.

Homeowners of Iske Place property brought suit as a corporation, I. P. Homeowners, Inc., against Harold Radtke and Juanita Radtke to obtain specific performance of an alleged oral contract or, in the alternative, to impress a constructive trust

upon real estate that the Radtkes purchased from a third party. The corporation based its action upon three separate theories: (1) an alleged breach of contract, (2) an alleged fraudulent misrepresentation, and (3) an alleged breach of fiduciary duty. We conclude that as stockholders of a close corporation, the Radtkes owed a fiduciary duty to the corporation and that the trial court was correct in imposing a constructive trust in favor of the corporation on the Radtkes' purchase.

The corporation cross-appeals because it was required to pay interest to the Radtkes on the money the Radtkes used to purchase the property. We conclude that the payment of interest is not required under the circumstances of this case, and therefore, we affirm the trial court's judgment as herein modified.

## FACTUAL BACKGROUND

Initially, we recount a brief overview of the undisputed facts contained in the instant suit. The land in question, referred to as "Iske Place," is a 35.6-acre tract of land in Sarpy County, Nebraska, which borders the Missouri River. The former owners of Iske Place, Gail Iske and Sally Iske, rented at least 47 individual parcels of the property to several tenants for $250 to $300 per year. Over the years, the tenants constructed homes on Iske Place, even though they did not own the underlying land. In January 1994, the Papio-Missouri River Natural Resources District (NRD) offered to purchase Iske Place for $150,000, whereupon the Iskes gave their tenants the opportunity to purchase the land for the same price and terms as the NRD offered. A group of tenants met and agreed to quickly form a corporation, I. P. Homeowners, Inc., and they made at least one offer to purchase Iske Place. Corporate representatives had agreed to meet with Gail Iske or his attorney on February 4 to further negotiate the sale. However, on February 3, the Iskes and the Radtkes entered into a "Lease and Purchase Agreement" under which the Radtkes agreed to lease the real estate for $20,000 until closing (at latest, February 1, 1995) and to pay a $130,000 purchase price.

The activities of the homeowners, the corporate officials, the Radtkes, the Iskes, and their attorneys during January and the first 3 days of February 1994 are much disputed and will be out-

lined in detail later in this opinion. After a full trial on the matter, the district court found that the Radtkes held Iske Place in a constructive trust for the corporation, subject to the corporation's reimbursement of the Radtkes for their payment on the property plus interest and any extra costs.

## ASSIGNMENTS OF ERROR

The Radtkes contend that the district court erred in (1) concluding that Harold Radtke made any promises to I. P. Homeowners, Inc., either before or after the signing of the purchase agreement on February 3, 1994; (2) finding that any promises of Harold Radtke to I. P. Homeowners, Inc., after February 3 were enforceable, because there was no consideration for them; (3) concluding that any alleged promises of Harold Radtke were enforceable because the evidence was clear that the corporation was financially unable to purchase the property; (4) finding that either Harold Radtke or Juanita Radtke was a promoter of I. P. Homeowners, Inc.; (5) finding that I. P. Homeowners, Inc., had any valid business opportunity, as the evidence showed that the corporation was financially unable to purchase the property; (6) ordering the equitable remedy of a constructive trust in light of the corporation's attempts to use Harold Radtke as its "ace in the hole"; and (7) failing to find that the alleged agreement between Harold Radtke and I. P. Homeowners, Inc., was barred by the statute of frauds.

I. P. Homeowners, Inc., cross-appeals, contending the district court erred in (1) ordering the corporation to pay interest on the principal sum paid for Iske Place and not ordering the Radtkes to pay all rents received from the residents of Iske Place since February 3, 1994, a total of $39,400 plus interest, and (2) failing to confirm title to Iske Place in the name of I. P. Homeowners, Inc., after the corporation deposited the requisite funds with the clerk of the district court.

## STANDARD OF REVIEW

In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, an

appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *NEBCO, Inc. v. Board of Equal. of City of Lincoln*, 250 Neb. 81, 547 N.W.2d 499 (1996); *Whitten v. Malcolm*, 249 Neb. 48, 541 N.W.2d 45 (1995); *Brtek v. Cihal*, 245 Neb. 756, 515 N.W.2d 628 (1994).

When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Baltensperger v. Wellensiek*, 250 Neb. 938, 554 N.W.2d 137 (1996); *Heins v. Webster County*, 250 Neb. 750, 552 N.W.2d 51 (1996).

## DISPUTED FACTS

Before diving into a legal analysis, we feel it is important, in our de novo review, to set forth the heavily disputed facts as presented at trial. For convenience, we refer to the tenants of Iske Place as the "homeowners."

On January 24, 1994, Gail Iske informed Esther Eby, one of the homeowners, that he was willing to give the homeowners 30 days to purchase Iske Place before selling it to the NRD. Iske gave Eby an unsigned offer of sale for $150,000 ($50,000 as a downpayment and $25,000 per year for 4 years with no interest), but excluded a dike and farm ground from the offer. Eby, who appears to have been the leader of the homeowners, communicated the offer to the other homeowners.

After hearing of the offer, Ursula Braesch, another homeowner, contacted Wandel Law Offices for the purpose of forming a corporation. Josephine Wandel and Bernard McNary, attorneys for Wandel Law Offices, subsequently met with Iske Place homeowners Ursula Braesch and Steven Braesch, Curtis Morrow, James Walker, and Eby at a bar on January 27, 1994, to discuss the possibility of purchasing Iske Place. As a result of the meeting, Wandel prepared articles of incorporation for I. P. Homeowners, Inc., which were filed with the Secretary of State on January 31.

Walker testified that after the meeting on January 27, 1994, he contacted Harold Radtke, who was vacationing in Arizona with Juanita Radtke, and informed Harold Radtke that the homeowners were attempting to form a corporation in order to

purchase Iske Place. Walker testified that Radtke replied that he "wanted to be counted in regardless." Radtke, on the other hand, testified that Walker called on January 24, that Walker never mentioned a corporation, and that Radtke rejected Walker's offer to participate in Walker's effort to purchase the property. Walker later spoke to Eby on the telephone and, according to Eby, told her that Radtke wanted her to "put in" for him. Eby testified that she called Radtke in Arizona to verify the substance of her conversation with Walker. Eby testified that she told Radtke that the homeowners had formed a corporation and asked if he wanted in. According to Eby, Radtke told her to contribute $100 for him, as each homeowner was going to contribute $100 for "a hundred shares" of stock, and to further contribute "whatever else amount it took to keep him in." Radtke, however, testified that Eby did not want anything to do with Walker's attempt at purchasing Iske Place and that she wanted to hire another attorney, Mike Lustgarten, to straighten things out and to prevent the NRD from purchasing the property. Radtke further testified that his $100 was to go toward the hiring of Lustgarten and that Eby never told him that his money had gone into a corporation.

On January 28, 1994, Eby and Morrow hired Lustgarten to oversee the formation of the corporation and to represent Eby's, Morrow's, and Harold Radtke's individual interests, rather than those of the corporation. Lustgarten confirmed that Eby asked him to represent Radtke.

The homeowners held a second meeting, on January 30, 1994, to determine who wanted to become members of the corporation. Twenty or more homeowners were present, as well as McNary, Wandel, and Lustgarten. Lustgarten agreed, upon Eby's request, to also represent Samuel Caniglia. McNary and Wandel passed out stock subscription agreements, which were signed by 12 homeowners, including Eby, Linda Morrow and Curtis Morrow, Samuel Caniglia and Gloria Caniglia, the Braesches, and Walker. One of the subscription agreements was signed "Harold Radtke by Esther Eby." Eleven of the homeowners also contributed $100 each for one share of stock. Eby testified that she had the authority to pay Harold Radtke's subscription fee and wrote two $100 checks, one for herself and her

husband and one with a notation "For Harold Radtke." A subscription receipt indicates that the corporation received $100 from Radtke in exchange for one share of stock. The receipt was signed by Eby, and underneath her signature, Lustgarten wrote, "Esther Eby, on behalf of Harold Radtke." The subscribers then elected three corporate representatives: Eby, Walker, and Steven Braesch.

Following the meeting, Wandel, McNary, and Eby went to the Iskes' house to present them with a proposed real estate land contract and a $1,000 earnest deposit. According to the proposed contract, the corporation offered to purchase Iske Place for $150,000, consisting of a $1,000 downpayment, a $49,000 payment at closing, and four annual payments of $25,000 plus interest. However, the agreement was never signed, and the check was never cashed. McNary testified that the Iskes made a counterproposal, the terms of which McNary wrote in on the last page of his copy of the proposed agreement. It appears from McNary's copy of the proposed agreement that the Iskes desired additional compensation for a dike and farm ground, which is consistent with the offer of sale originally given to Eby by Gail Iske. On January 31, 1994, McNary spoke with the attorney for the Iskes, Dean Jungers, concerning the proposed contract and made arrangements to meet with him on February 4, presumably to finalize the purchase. No agreement was ever entered into between the Iskes and the corporation.

Lustgarten testified that he was informed by Eby on February 1, 1994, that the corporation's first offer had not been accepted by the Iskes and that the corporation was discussing making a second offer, of $175,000. Lustgarten specifically admitted that as of February 1, he believed that Eby, Samuel Caniglia, and Harold Radtke were going to go through with the purchase of Iske Place as part of the corporation. This information was reflected in a February 1 letter from Lustgarten to Eby, Curtis Morrow, Caniglia, and Radtke in which Lustgarten refers to his four clients as "stock holders" in the corporation.

The Radtkes returned from Arizona on January 31, 1994, and that night, Harold Radtke called Gail Iske. According to Radtke, Iske told him that both Walker and Eby had made offers, but that "it didn't look good." Radtke specifically testified that Iske

also told him that a group of Iske Place residents had made offers to purchase the property. After talking with his banker, Radtke spoke with Iske again on February 1 or 2. According to Radtke, Iske told him that it did not look like "they" were getting a deal together. Radtke further testified that Eby told him that "they" could not come up with the money and that he should contact Lustgarten about purchasing the place himself. Interestingly, at trial, Radtke was unable to define his use of the term "they" and continued to maintain that he was unaware of the homeowners' attempt to purchase the property.

Eby's version of the events of February 1 and 2, 1994, varies significantly from Harold Radtke's version. According to Eby, on February 1, she told Radtke that he was in the corporation, that Lustgarten was representing them, and that the corporation was proceeding to buy Iske Place. On February 2, Radtke came to her house to ask permission to purchase Iske Place himself. Radtke told Eby that if he was allowed to purchase the property, the homeowners could have 10-year leases, the homeowners could have a 5-year option to purchase the property at the same price, and the homeowners' rent would not increase unless taxes increased (hereinafter referred to as the "representations"). In Eby's presence, Radtke made the same representations to Steven Braesch, another representative of the corporation. After speaking with Walker, the third representative, Braesch and Eby told Radtke that if the corporation was unable to reach an agreement with the Iskes on February 4, then Radtke could purchase the property himself.

Lustgarten testified as to his own version of the events of February 1 and 2, 1994. According to Lustgarten, Eby called him on February 2 "in a state of panic," claiming that everyone was "ba[i]ling out" and that she only had until February 4, the date that the Iskes were going to sell to the NRD, to purchase the property. Eby then asked Lustgarten if he would represent Harold Radtke in an individual purchase of the property. Lustgarten told Eby that Radtke would have to call him and further that if he represented Radtke, he could no longer represent the other three individuals. Radtke called and retained Lustgarten, and Lustgarten informed Eby, as spokesperson, that he would no longer be representing the three remaining clients.

Lustgarten also informed Eby that if Radtke bought the property, he could do whatever he wanted with it. At trial, Lustgarten could not recall whether he ever discussed the corporation or the corporation's efforts to purchase Iske Place with Radtke.

Gail Iske also testified concerning the events prior to February 3, 1994. Iske, who could not remember certain undisputed events, testified that he knew that a group of homeowners was attempting to purchase Iske Place. At one point in his testimony, Iske stated that Harold Radtke had told him that the members of the group had agreed among themselves to allow Radtke to purchase the property. However, later in his testimony, Iske stated that Eby had told him that Radtke, instead of the corporation, could buy the property.

On February 3, 1994, Juanita Radtke called Eby and told her to meet her and Harold Radtke at Jungers' office. According to Eby, she met the Radtkes outside the building, where Harold Radtke told her that he was going to purchase Iske Place for $150,000 and that the corporation " 'would be taken care of.' " Radtke again made the representations concerning the 10-year leases, rent, and the 5-year option to purchase. Lustgarten backed up Radtke's promises and asked Eby if she had any problems with him also representing Radtke, presumably in an individual capacity. Lustgarten and the Radtkes all denied that any representations were made to Eby outside of Jungers' office. Lustgarten testified that he told Eby that if Radtke purchased the property, Radtke could do whatever he wanted with it.

It is undisputed that the persons present at the meeting were the Radtkes, the Iskes, Eby, Lustgarten, and Jungers. Without objection by Eby, the Radtkes and the Iskes entered into a lease and purchase agreement whereby the Iskes agreed to lease the property for $20,000 until closing, at which time the remaining $130,000 was to be paid to purchase the property. Eby testified that following the signing of the agreement, she and the Radtkes went down to Iske Place, where Harold Radtke made the representations to the Morrows, the Braesches, the Caniglias (on February 10, 1994), and Walker (on February 11). Eby was also present at the closing on July 11, when the deeds to Iske Place were transferred. Either in March or in April, the Radtkes raised

the annual rent from $250 to $300 per lot to $500 per lot, and according to Steven Braesch, the Radtkes further increased the rent after the corporation decided to file the lawsuit. Furthermore, although Lustgarten claimed that he no longer represented Eby, Curtis Morrow, and Samuel Caniglia, he did bill Eby for phone calls and a conference in April concerning leases.

Harold Radtke testified that he never made any of the representations to any of the homeowners. Radtke also testified that he had no knowledge of the corporation until the suit was filed against him. Concerning the February 1, 1994, letter from Lustgarten to Radtke which informed Radtke that he was a stockholder of the corporation, Radtke testified that he did not receive it until February 4, after he had purchased Iske Place, and further that he only glanced at it before throwing it away. Juanita Radtke also testified that the Radtkes never made any promises before the purchase. At trial, the corporation introduced a taped conversation between Eby and Juanita Radtke in which Juanita Radtke admitted to the representations. However, as Eby can clearly be heard whispering the desired answers to Juanita Radtke, we find that the tape is of no value.

Eby gave various accountings of how the corporation was going to finance a $175,000 purchase. At trial, Eby testified that the corporation was going to put $10,000 down on February 4, 1994; put $50,000 down at closing; borrow $100,000 from Walker's bank, Bank of Bellevue; and also borrow from Walker's friend, Russell Langdon. Eby testified that each subscriber was going to pay $5,000 in order to raise the $50,000. According to Eby, "[t]here was no way that we would have failed in acquiring Iske Place." However, Eby admitted that at an earlier deposition she claimed that the corporation was going to borrow $165,000 from Bank of Bellevue.

There was also testimony about an "ace in the hole" who would help the corporation out with any financing problems. McNary testified that after the land was purchased, Walker told him that Harold Radtke was the ace in the hole. However, Walker testified that the ace in the hole was Langdon. Langdon testified that he gave Walker the unlimited authority to write a check against Langdon's account, interest free. Langdon testi-

fied that at that point in time, he had sufficient funds to put up $100,000. Thomas Wilson, a commercial lender for Bank of Bellevue, testified that Walker and a group of individuals were discussing borrowing $100,000 to purchase the property. It does not, however, appear that any applications for a loan were ever submitted. Wilson further testified that it was the bank's policy to loan approximately 70 percent of the value of that type of property.

## FINDING OF TRIAL COURT

The trial court found that the Radtkes held Iske Place in a constructive trust for the corporation.

## DE NOVO REVIEW OF FACTS

In the instant case, it is undisputed that the Iskes provided the homeowners with the opportunity to purchase Iske Place, as evidenced by the proposed offer of sale, before selling it to the NRD. The homeowners met and decided to form a corporation, I. P. Homeowners, Inc., to attempt to purchase Iske Place. I. P. Homeowners, Inc., filed its articles of incorporation with the Secretary of State on January 31, 1994, and 11 of the homeowners paid $100 each for 1 share of stock in the corporation. Pursuant to Harold Radtke's instructions, Eby contributed $100 for Radtke to become a stockholder in the corporation. Lustgarten, who admitted that he was representing Eby, Curtis Morrow, Samuel Caniglia, and Radtke, wrote on Radtke's subscription receipt, "Esther Eby, on behalf of Harold Radtke." Despite the subscription receipt and his February 1 letter to Radtke detailing Radtke's status as a stockholder in the corporation, Lustgarten could not recall whether he ever discussed the corporation or the corporation's efforts to purchase Iske Place with Radtke. The general rule is that notice to, or knowledge of facts by, an attorney is notice to, or knowledge of, his client. *Unland v. City of Lincoln*, 247 Neb. 837, 530 N.W.2d 624 (1995) (discussions between officer and defendant's attorney were sufficient to give defendant notice of charges against him); *City of Hastings v. Jerry Spady Pontiac-Cadillac, Inc.*, 212 Neb. 137, 322 N.W.2d 369 (1982) (knowledge of city's interest in property imputed to client).

Harold Radtke essentially testified that in all his discussions with Eby, Walker, Gail Iske, and Lustgarten, he never became aware of the corporation until it filed suit against him on November 10, 1994. We note that Radtke admitted that Iske had told him, prior to the Radtkes' purchase of Iske Place, that a group of homeowners had made offers to purchase the property. Harold Radtke attempted to deny his knowledge of the corporation by referring to the members of the group as "they," without defining the word. While we find inconsistencies in the stockholders' testimony, we are convinced that prior to his purchase of Iske Place on February 3, Radtke knew that he was a stockholder of the corporation. In fact, Lustgarten's knowledge is imputed to him. See *City of Hastings v. Jerry Spady Pontiac-Cadillac, Inc., supra.*

## ANALYSIS

We need not address the corporation's first two causes of action because we find in favor of the corporation under its third cause of action, breach of fiduciary duty.

*Fiduciary Duty.*

 Shareholders in a close corporation owe one another the same fiduciary duty as that owed by one partner to another in a partnership. *Russell v. First York Sav. Co.*, 218 Neb. 112, 352 N.W.2d 871 (1984), *disapproved on other grounds, Van Pelt v. Greathouse*, 219 Neb. 478, 364 N.W.2d 14 (1985). See, also, *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983).

> Shareholders in a close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another, to act among themselves in the utmost good faith and loyalty. This reliance on partnership principles is appropriate since many close corporations are in substance partnerships by another name. Unlike the holders of public stock, who can sell their stock when disagreements over management arise, shareholders in a small corporation do not usually have an available market to sell their shares. The mere fact that a business is run as a corporation rather than a part-

nership does not shield the business venture from a fiduciary duty similar to that of true partners.

12B William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 5713 at 2 (Cum. Supp. 1996).

In *Anderson v. Clemens Mobile Homes*, 214 Neb. at 288, 333 N.W.2d at 904, the Nebraska Supreme Court, in imposing a fiduciary relationship between the two shareholders of a corporation, stated:

> It has been held that although an officer or a director of a corporation is not necessarily precluded from entering into a separate business because it is in competition with the corporation, his fiduciary relationship to the corporation and its stockholders is such that if he does so he must prove by a preponderance of the evidence that he did so in good faith and did not act in such a manner as to cause or contribute to the injury or damage of the corporation, or deprive it of business; if he fails in this burden of proof, there has been a breach of that fiduciary trust or relationship. [Citations omitted.] The general rule is stated to be that a director or other corporate officer cannot acquire an interest adverse to that of the corporation while acting for the corporation or when dealing individually with third persons.

However, generally, no corporate opportunity exists if the corporation is by itself financially unable to undertake the opportunity, and a corporate officer has no specific duty to use or pledge his personal funds to enable the corporation to take advantage of a business opportunity. To be a corporate opportunity, the business must generally be one of practical advantage to the corporation and must fit into and further an established corporate policy. *Id.* (finding it was not clear that corporation would have been unable to take advantage of usurped opportunities).

In *Nebraska Power Co. v. Koenig*, 93 Neb. 68, 139 N.W. 839 (1913), a corporation brought suit against Koenig, a former engineer and director of the corporation, over an application to divert water from the Loup River. As part of his employment, Koenig had access to the corporation's records and engineering data. Koenig made an application to divert in his own name,

resigned his directorate, and in a legal contest, prayed for the cancellation of all of the corporation's prior applications. The corporation then sought to enjoin Koenig from attempting to cancel its applications. The trial court found that Koenig made his application as a fiduciary and therefore held the application in trust for the corporation. On appeal, the issue was whether Koenig's application was held in trust for the corporation.

The court found that Koenig's directorate was a confidential relation that made him the corporation's fiduciary. The court stated that directors are not permitted to anticipate the corporation in the acquisition of property reasonably necessary for carrying out the corporate purposes or conducting the corporate business. The court went on to find that Koenig's fiduciary relation prevented him from acquiring adverse rights to waters of the same stream. The court held that equity would operate upon the conscience of Koenig and restore to the corporation the benefits of Koenig's hostile acts, without regard to the nature of the adverse interests he attempted to acquire. Thus, the court upheld the imposition of the trust.

█ Both *Anderson* and *Koenig* deal with the usurpation of corporate opportunities by officers or directors. The traditional remedy imposed by courts upon a finding of a misappropriation of a corporate opportunity is the impression of a constructive trust in favor of the corporation upon the property. 3 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 861.50 (rev. perm. ed. 1994). However, in the instant case, the corporate opportunity was taken by a shareholder. As stated above, shareholders in a close corporation owe one another the same fiduciary duty as that owed by one partner to another in a partnership. *Russell v. First York Sav. Co.*, 218 Neb. 112, 352 N.W.2d 871 (1984), *disapproved on other grounds, Van Pelt v. Greathouse*, 219 Neb. 478, 364 N.W.2d 14 (1985). Nebraska's Uniform Partnership Act provides at Neb. Rev. Stat. § 67-321(1) (Reissue 1990) that every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

■ The Nebraska Supreme Court in *Bode v. Prettyman*, 149 Neb. 179, 188-89, 30 N.W.2d 627, 631-32 (1948), further detailed the duty between partners:

The law requires the utmost frankness and absolute honesty in the dealings of one partner with another. As trustees, they cannot derive a secret profit from partnership transactions unknown to the other. [Citations omitted.]

" '[A] partner . . . has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess such property for any other purpose without the consent of his partners.' " [Citation omitted.]

Partners must exercise the utmost good faith in all their dealings with the members of the firm. A partner must at all times act for the common benefit of all. He must not take advantage of a partner by the slightest concealment or misrepresentation of any kind. [Citation omitted.]

"Law will not permit those associated in relationships in which mutual confidence and trust are ingredients to put themselves in position where their individual interests may have tendency to cause them to relax in their vigilance for the common good, or to make secret individual profits out of common activities."

Regarding a partner's duty to the other partners, the taking of a partnership opportunity has been compared with the taking of a corporate opportunity. Alan R. Bromberg and Larry E. Ribstein, in their treatise on partnership, stated:

The partners have a duty not only regarding property currently owned and transactions engaged in by the partnership but also regarding their outside business activities that involve opportunities—or potential property or transactions—of the partnership. Although the partnership does not have a conventional property right in such "opportunities" in the sense of being able to exclude third parties from possession, it does have such a right as against the partners individually. One reason for giving the partnership this property right is that exploitation of a partnership opportunity may involve use of partnership assets and

information . . . . A second reason is that, like self-dealing liability, preventing partners from exploiting partnership opportunities helps ensure that the partners will exercise their energies for the benefit of the partnership rather than for their personal gain.

. . . .

If an opportunity is deemed to belong to the partnership, the courts will usually hold the usurping partner accountable (unless the other partners were aware of the opportunity and turned it down), even if the defendant claims that the partnership would have been unable or unwilling to take advantage of the opportunity if it had been offered. . . . It would be anomalous to permit the usurping partner to hide behind protestations of financial inability in light of the fact that the partner often has substantial control over such circumstances. Moreover, if the partner could finance the deal, the partnership could probably also have done so.

II Alan R. Bromberg & Larry E. Ribstein, Bromberg and Ribstein on Partnership § 6.07(d) at 6:77-6:83 (1996).

In the instant case, the Radtkes were informed of the potential purchase of Iske Place because of their status as homeowners. We do not decide whether the Radtkes initially owed a duty to the other homeowners. However, once the Radtkes became stockholders of the close corporation, they owed the other stockholders the same fiduciary duty that partners owe to one another in a partnership. See *Russell v. First York Sav. Co., supra.* As stated above, partners must exercise the utmost good faith in all their dealings with the members of the partnership and further must at all times act for the common benefit of all. See *Bode v. Prettyman, supra.* The partnership creates a confidential relation. See *Koefoed v. Thompson,* 73 Neb. 128, 102 N.W. 268 (1905) (where party obtained legal title to property by virtue of confidential relation as partner, court imposed constructive trust). See, also, *Fleury v. Chrisman,* 200 Neb. 584, 264 N.W.2d 839 (1978) (noting some circumstances that create confidential relations).

*Imposition of Constructive Trust.*

We conclude that the Radtkes breached their fiduciary duty to the other stockholders. Corporate representatives and the Iskes' attorney, Jungers, had scheduled a meeting on February 4, 1994, to discuss the corporation's possible purchase of Iske Place. While it was uncertain whether an agreement would be reached, it is clear that the corporation still had the opportunity to purchase the property. Thus, the Radtkes' purchase of the property on February 3 denied the corporation any opportunity that it might have had of acquiring the property. Any argument by the Radtkes that the corporation consented to their purchase of Iske Place is unpersuasive. The Radtkes may have had permission to purchase the property if the corporation was unable to do so on February 4, but they did not have the corporation's consent to enter into the agreement with the Iskes on February 3. At most, the Radtkes had the consent of Eby, whose acquiescence as only one of three elected corporate representatives was insufficient to be deemed a consensual act on behalf of the corporation, especially considering that Eby was lulled into inaction by Harold Radtke's representations concerning leases, rent, and the option to purchase. The Radtkes also maintain that the corporation was unable to finance the purchase. It is not at all clear that the corporation would have been unable to take advantage of the opportunity to purchase Iske Place. See *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983). We conclude that the Radtkes breached their fiduciary duty to the other stockholders by usurping the corporate opportunity to purchase Iske Place.

Generally, a court sitting in equity will not impose a constructive trust and constitute an individual as a trustee of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relation and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. *Brtek v. Cihal*, 245 Neb. 756, 515 N.W.2d 628 (1994); *Wells v. Wells*, 3 Neb. App. 117, 523 N.W.2d 711 (1994). A constructive trust is a relationship, with

respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the grounds that his or her acquisition or retention of the property would constitute unjust enrichment. *Brtek v. Cihal, supra; Wells v. Wells, supra.*

◼ It has long been held that constructive trusts are excepted from the operation of the statute of frauds. See, Neb. Rev. Stat. § 36-103 (Reissue 1993) ("[n]o estate or interest in land . . . nor any trust . . . shall hereafter be created, granted, assigned, surrendered, or declared, unless by operation of law, or by deed of conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same"); Neb. Rev. Stat. § 36-104 (Reissue 1993) (§ 36-103 "shall not be construed . . . to prevent any trust from arising or being extinguished by implication or operation of law"). See, also, *Light v. Ash*, 174 Neb. 44, 115 N.W.2d 903 (1962); *Wiskocil v. Kliment*, 155 Neb. 103, 50 N.W.2d 786 (1952).

The corporation proved by clear and convincing evidence that the Radtkes obtained title to Iske Place by abusing their confidential relation as shareholders of the corporation. The Radtkes breached their fiduciary duty by usurping the corporate opportunity. Thus, the imposition of a constructive trust is the appropriate remedy.

*Accounting for Constructive Trusts.*

◼ We conclude that the Radtkes hold the 39,400 dollars' worth of rents accumulated in trust for the corporation. After a court imposes a constructive trust, it may determine the matter of the accounting of rents and profits. See, e.g., *Fleury v. Chrisman*, 200 Neb. 584, 264 N.W.2d 839 (1978). A constructive trustee is accountable to the beneficiary for the rents received on property held in trust. See, e.g., *Bowen v. Watz*, 5 Ariz. App. 519, 428 P.2d 694 (1967) (constructive trustees of land must hold proceeds from use thereof, such as rent, which have been received in meantime, for benefit of original beneficiaries); *Bank of America v. Ryan*, 207 Cal. App. 2d 698, 24 Cal. Rptr. 739 (1962) (if constructive trust is to be imposed on money and other property, beneficiary thereof is entitled to recover not only money and property so acquired but also

interest on such money at legal rate from time of its receipt and rents, income, and profits on such property together with interest thereon at legal rate from time of receipt); *Ryan v. Plath*, 18 Wash. 2d 839, 140 P.2d 968 (1943) (on theory of unjust enrichment, constructive trustee may be compelled to convey or assign corpus of trust property and to account for and pay over rents, profits, issues, and income which constructive trustee has actually received or, in general, which he might by exercise of reasonable care and diligence have received); 76 Am. Jur. 2d *Trusts* § 413 (1992) (one holding property under constructive trust is chargeable only with rents actually received); Annot., 36 A.L.R. 1331 (1925). See, also, § 67-321 (every partner must account to partnership for any benefit and hold as trustee for it any profits derived by him without consent of other partners from any transaction connected with formation, conduct, or liquidation of partnership or from any use by him of its property). The Radtkes must therefore account for the rents received as constructive trustees.

*Interest and Other Expenses.*

Generally, a trustee may be reimbursed or indemnified for expenses incurred or advances made in the execution of the trust, and a constructive trustee who has paid purchase money for the benefit of the trust should be allowed credit for such purchase money. 90 C.J.S. *Trusts* § 471 f. (1955). A constructive trustee may also be entitled to compensation for managing property, where he is chargeable with rents. See *Olson v. Lamb*, 56 Neb. 104, 76 N.W. 433 (1898). However, the Radtkes failed to produce evidence of any such expenses.

We observe that the Radtkes did not prove any interest costs or expenses of the trust. There is no evidence which would establish the interest as an expense of the trust, which might be deductible in an accounting trust deed. The trial court simply allowed $12,886 in interest, which was to be paid together with the principal within 60 days of the date of the order. We note, however, that the Radtkes did not comply with Neb. Rev. Stat. § 45-103.02 (Cum. Supp. 1996), the prejudgment interest statute. Additionally, interest on property held in a constructive trust is not provided for under Neb. Rev. Stat. § 45-104 (Reissue

1993), which allows for interest on certain contractual obligations. There is a split of authority on whether a constructive trustee may recover interest on the purchase price of the trust property. See, 90 C.J.S., *supra*; *White Gates Skeet Club, Inc. v. Lightfine*, 276 Ill. App. 3d 537, 658 N.E.2d 864 (1995) (constructive trustees who breached their fiduciary duty by usurping corporate opportunity were not permitted to recover interest on money used to purchase property); *Ryan v. Plath, supra* (constructive trustee was allowed interest on such purchase money). The Nebraska Supreme Court has held that in cases of actual fraud, a court of equity should deny any recovery for services rendered to the trust estate. *Tuttle v. Wyman*, 149 Neb. 769, 32 N.W.2d 742 (1948). The foregoing authorities persuade us to conclude, similar to the court in *White Gates Skeet Club, Inc. v. Lightfine, supra*, that it would be contrary to public policy to allow the Radtkes interest on the money they used to usurp a corporate opportunity. We further conclude that there is no evidence of any allowable trust expenses.

### Enforcement of Decree.

The trial court ordered the corporation to pay $162,886 to the clerk of the court within 60 days of the order or forever be barred from any interest in Iske Place. After the corporation timely paid, it filed a motion to confirm title. The trial court dismissed the corporation's motion for lack of jurisdiction because the Radtkes had already perfected their appeal.

An appeal does not operate as a stay of proceedings unless an appellant supersedes the judgment or final order in the manner provided by law. *Production Credit Assn. of the Midlands v. Schmer*, 233 Neb. 785, 448 N.W.2d 141 (1989). In the absence of a supersedeas, a judgment or final order retains its vitality and is capable of being executed during the pendency of the appeal. *Production Credit Assn. of the Midlands v. Schmer, supra*; *Travelers Ins. Co. v. Nelson*, 4 Neb. App. 551, 546 N.W.2d 333 (1996). In the instant case, the Radtkes failed to supersede the order by complying with the requirements of Neb. Rev. Stat. § 25-1916(3) (Reissue 1995). The motion to confirm the sale was merely a means of asking the court to enforce its

unsuperseded decree. Consequently, the trial court erred in failing to confirm title to the property in the corporation.

## CONCLUSION

We affirm the trial court's imposition of a constructive trust in favor of the corporation and modify the decree to require the corporation to pay to the Radtkes $110,600, which is the purchase price of $150,000 less the $39,400 in rents collected by the Radtkes. The record indicates the corporation has paid $162,886 to the district court. The court should distribute the money and any earnings thereon in accordance with this modification.

AFFIRMED AS MODIFIED.